# EXHIBIT 2

 CT Corporation

**Service of Process Transmittal**
08/01/2018
CT Log Number 533801543

TO: Stephanie Youngman
Johnson & Johnson
1 Johnson and Johnson Plz
New Brunswick, NJ 08933-0002

RE: **Process Served in Ohio**

FOR: Ortho-McNeil-Janssen Pharmaceuticals, Inc. (Former Name) (Domestic State: PA)
Janssen Pharmaceuticals, Inc. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | County of Lexington, Pltf. vs. Rite Aid of South Carolina, Inc., et al., Dfts. // To: Orthomcneil-Janssen Pharmaceuticals, Inc. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Lexington County - 11th Circuit Court, SC Case # 2018CP3202207 |
| **NATURE OF ACTION:** | Deceptive marketing practices relating to prescription opioids |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Columbus, OH |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/01/2018 at 12:40 |
| **JURISDICTION SERVED :** | Ohio |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | John S. Simmons SIMMONS LAW FIRM, LLJC 1711 Piekens Street Columbia, SC 29201 803-254-8874 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/03/2018, Expected Purge Date: 08/13/2018 Image SOP Email Notification, RA-JJCUS LDSOP RA-JJCUS-LDSOP@its.jnj.com |
| **SIGNED:** ADDRESS: | C T Corporation System 4400 Easton Commons Way Suite 125 Columbus, OH 43219 |
| **TELEPHONE:** | 617-531-5859 |

Page 1 of 1 / RP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
08/01/2018
CT Log Number 533801568

TO: Stephanie Youngman
Johnson & Johnson
1 Johnson and Johnson Plz
New Brunswick, NJ 08933-0002

RE: **Process Served in Ohio**

FOR: Janssen Pharmaceutica Inc. (Former Name) (Domestic State: PA)
Janssen Pharmaceuticals, Inc. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | County of Lexington, Pltf. vs. Rite Aid of South Carolina, Inc., et al., Dfts. // To: Janssen Pharmaceutica, Inc. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Lexington County - 11th Circuit Court, SC Case # 2018CP3202207 |
| **NATURE OF ACTION:** | Deceptive marketing practices relating to prescription opioids |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Columbus, OH |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/01/2018 at 12:40 |
| **JURISDICTION SERVED :** | Ohio |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | John S. Simmons SIMMONS LAW FIRM, LLJC 1711 Piekens Street Columbia, SC 29201 803-254-8874 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/03/2018, Expected Purge Date: 08/13/2018 |
| | Image SOP |
| | Email Notification, RA-JJCUS LDSOP  RA-JJCUS-LDSOP@its.jnj.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 4400 Easton Commons Way Suite 125 Columbus, OH 43219 |
| **TELEPHONE:** | 617-531-5859 |

Page 1 of  1 / RP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 **CT Corporation**

**Service of Process Transmittal**
08/01/2018
CT Log Number 533807742

**TO:** Stephanie Youngman
Johnson & Johnson
1 Johnson and Johnson Plz
New Brunswick, NJ 08933-0002

**RE:** **Process Served in Ohio**

**FOR:** Janssen Pharmaceuticals, Inc.  (Domestic State: PA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | County of Lexington, Pltf. vs. Rite Aid of South Carolina, Inc., et al., Dfts. // To: Janssen Pharmaceuticals, Inc. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Lexington County - Court of Common Please, SC Case # 2018CP3202207 |
| **NATURE OF ACTION:** | Deceptive marketing practices relating to prescription opioids |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Columbus, OH |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/01/2018 at 12:40 |
| **JURISDICTION SERVED :** | Ohio |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | John S. Simmons Simmons Law Firm, LLC 1711 Pickens Street Columbia, SC 29201 803-254-8874 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/03/2018, Expected Purge Date: 08/13/2018 Image SOP Email Notification,  RA-JJCUS LDSOP  RA-JJCUS-LDSOP@its.jnj.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 4400 Easton Commons Way Suite 125 Columbus, OH 43219 |
| **TELEPHONE:** | 617-531-5859 |

Page 1 of  1 / DV

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.


**CT Corporation**

**Service of Process Transmittal**
08/01/2018
CT Log Number 533807753

**TO:** Stephanie Youngman
Johnson & Johnson
1 Johnson and Johnson Plz
New Brunswick, NJ 08933-0002

**RE: Process Served in Ohio**

**FOR:** Ortho-McNeil-Janssen Pharmaceuticals, Inc.  (Former Name)  (Domestic State: PA)
Janssen Pharmaceuticals, Inc. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | County of Lexington, Pltf. vs. Rite Aid of South Carolina, Inc., et al., Dfts. // To: Orthomcneil-Janssen Pharmaceuticals, Inc., etc. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Lexington County - Court of Common Please, SC Case # 2018CP3202207 |
| **NATURE OF ACTION:** | Deceptive marketing practices relating to prescription opioids |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Columbus, OH |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/01/2018 at 12:40 |
| **JURISDICTION SERVED :** | Ohio |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | John S. Simmons Simmons Law Firm, LLC 1711 Pickens Street Columbia, SC 29201 803-254-8874 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/03/2018, Expected Purge Date: 08/13/2018 Image SOP Email Notification,  RA-JJCUS LDSOP  RA-JJCUS-LDSOP@its.jnj.com |
| **SIGNED:** ADDRESS: **TELEPHONE:** | C T Corporation System 4400 Easton Commons Way Suite 125 Columbus, OH 43219 617-531-5859 |

Page 1 of  1 / DV

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | **IN THE COURT OF COMMON PLEAS** |
| ) | |
| COUNTY OF LEXINGTON ) | **ELEVENTH JUDICIAL CIRCUIT** |
| ) | |
| County of Lexington ) | Case No.: |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Rite Aid of South Carolina, Inc.; Purdue ) | |
| Pharma L.P.; Purdue Pharma Inc.; The ) | |
| Purdue Frederick Company, Inc.; Teva ) | |
| Pharmaceuticals USA, Inc.; Cephalon, ) | |
| Inc.; Johnson & Johnson; Janssen ) | |
| Pharmaceuticals, Inc.; Orthomcneil- ) | |
| Janssen Pharmaceuticals, Inc. n/k/a ) | |
| Janssen Pharmaceuticals, Inc.; Janssen ) | |
| Pharmaceutica, Inc. n/k/a Janssen ) | |
| Pharmaceuticals, Inc.; Endo Health ) | **SUMMONS** |
| Solutions, Inc.; Endo Pharmaceuticals, ) | **(Jury Trial Demanded)** |
| Inc.; Allergan PLC f/k/a Actavis PLC; ) | |
| Actavis, Inc. f/k/a Watson ) | |
| Pharmaceuticals, Inc.; Watson ) | |
| Laboratories, Inc.; Actavis LLC; Actavis ) | |
| Pharma, Inc. f/k/a Watson Pharma, Inc.; ) | |
| INSYS Therapeutics, Inc.; Mckesson ) | |
| Corporation; Cardinal Health, Inc.; ) | |
| AmerisourceBergen Corporation; CVS ) | |
| Pharmacy, Inc.; CVS Health Corporation; ) | |
| Leavis Sullivan; Mark Waldrop; ) | |
| Aathirayen Thiyagarajah; Pain and Spine ) | |
| Consultants, PA; John Doe 1; John Doe ) | |
| 2; Clinic 1; and Clinic 2, ) | |
| ) | |
| Defendants. ) | |

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action,

a copy of which is herewith served upon you, and to serve a copy of your Answer to said

Complaint on the subscriber at their offices, 1711 Pickens Street, Post Office Box Five,

Columbia, South Carolina, 29202, within thirty (30) days after the service hereof, exclusive of

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

the date of service; and if you fail to answer the Complaint within time aforesaid, judgment by default will be rendered against you for the relief demanded in the Complaint.

Respectfully submitted,

/s/ John S. Simmons
**SIMMONS LAW FIRM, LLC**
John S. Simmons (SC Bar No. 10260)
Email: jsimmons@simmonslawfirm.com
Derek A. Shoemake (SC Bar No. 78398)
Email: dshoemake@simmonslawfirm.com
1711 Pickens Street, Columbia, SC 29201
(803) 254-8874

Attorneys for Plaintiff

June 27, 2018

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| COUNTY OF LEXINGTON | ) | **ELEVENTH JUDICIAL CIRCUIT** |
| | ) | |
| County of Lexington | ) | Case No.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Rite Aid of South Carolina, Inc.; Purdue | ) | |
| Pharma L.P.; Purdue Pharma Inc.; The | ) | |
| Purdue Frederick Company, Inc.; Teva | ) | |
| Pharmaceuticals USA, Inc.; Cephalon, | ) | |
| Inc.; Johnson & Johnson; Janssen | ) | |
| Pharmaceuticals, Inc.; Orthomcneil- | ) | |
| Janssen Pharmaceuticals, Inc. n/k/a | ) | |
| Janssen Pharmaceuticals, Inc.; Janssen | ) | |
| Pharmaceutica, Inc. n/k/a Janssen | ) | |
| Pharmaceuticals, Inc.; Endo Health | ) | **COMPLAINT** |
| Solutions, Inc.; Endo Pharmaceuticals, | ) | **(Jury Trial Demanded)** |
| Inc.; Allergan PLC f/k/a Actavis PLC; | ) | |
| Actavis, Inc. f/k/a Watson | ) | |
| Pharmaceuticals, Inc.; Watson | ) | |
| Laboratories, Inc.; Actavis LLC; Actavis | ) | |
| Pharma, Inc. f/k/a Watson Pharma, Inc.; | ) | |
| INSYS Therapeutics, Inc.; Mckesson | ) | |
| Corporation; Cardinal Health, Inc.; | ) | |
| AmerisourceBergen Corporation; CVS | ) | |
| Pharmacy, Inc.; CVS Health Corporation; | ) | |
| Leavis Sullivan; Mark Waldrop; | ) | |
| Aathirayen Thiyagarajah; Pain and Spine | ) | |
| Consultants, PA; John Doe 1; John Doe | ) | |
| 2; Clinic 1; and Clinic 2, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, the County of Lexington, South Carolina ("Plaintiff"), by and through the undersigned attorneys, upon personal knowledge as to its own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, for its Complaint against Defendants above named, alleges as follows:

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

## NATURE OF THE CASE

1.      The prescription opium-like painkiller ("opioid") crisis is prevalent in Lexington County.

2.      According to the South Carolina Department of Health and Environmental Control ("DHEC"), of all counties in South Carolina, Lexington ranks seventh both for the total number of deaths due to opioid overdose and for the administration of naloxone/Narcan (a medication designed to rapidly reverse opioid overdose).

3.      Opioids – including brand-name drugs like OxyContin and Percocet and generics like oxycodone and hydrocodone – are derived from or possess properties similar to opium and heroin. The United States Food and Drug Administration ("FDA") regulates these highly addictive and dangerous drugs as controlled substances.

4.      On December 18, 2017, Gov. Henry McMaster declared a statewide public health emergency as part of an effort to curb the rising death toll of opioid abuse in South Carolina.

5.      According to DHEC:

> i. In 2015, 594 South Carolina residents died from an opioid-related drug overdose, up from 459 deaths in 2014. In 2016, 550 deaths occurred in South Carolina from a drug overdose with prescription opioid drugs listed on the death certificate.
>
> ii. In 2016, nearly five million opioid prescriptions were dispensed in South Carolina for a population of 4,961,119.
>
> iii. In 2015, overdoses involving heroin increased by 57% from 2014.
>
> iv. In 2016, deaths from heroin and opioid overdoses outnumbered homicides (366) and deaths from drunk driving (331).

6.      Additionally, State Medicaid data shows that 1,855 prescriptions of OxyContin (more than $1 million worth) were reimbursed under the state-run insurance program in 2016. In 2012, 3,620 prescriptions (worth more than $2 million) were reimbursed.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

7.      This crisis also creates unique costs – financial and human – that are increasingly borne at the local government level. Specifically, Plaintiff spends millions of dollars each year to provide or pay for the health care, pharmaceutical care, and other necessary services and programs on behalf of indigents and otherwise eligible residents, including payments for opioids, which are manufactured, marketed, promoted, sold, and/or distributed by the Defendants.

8.      Plaintiff provides a wide range of other services on behalf of its residents, including services for families and children, public assistance, and law enforcement, and depends on the health and productivity of its workforce to generate tax revenue.

9.      Defendants have injured Plaintiff as detailed herein by manufacturing, promoting, and marketing opioids for the long-term management of chronic pain by misleading consumers and medical providers through misrepresentations or omissions regarding the appropriate uses, risks, and safety of opioids.

## JURISDICTION AND VENUE

10.      Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

11.      Plaintiff is a body politic in the State of South Carolina.

12.      This Court has jurisdiction over this action pursuant to SC Const. art. VIII. §17; SC Const. art. V. §11; SC Code Ann. § 15-72-10; SC Code Ann. § 14-1-80; SC Code Ann. § 4-9-25; SC Code Ann. § 4-9-670; and SC Code Ann. § 36-2-803.

13.      This Court has personal jurisdiction over Defendants because they conduct business in South Carolina and Lexington County; purposefully direct or directed their negligent and injurious actions toward South Carolina and Lexington County; consensually submitted to the jurisdiction of South Carolina when obtaining a manufacturer or distributor license; have

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

headquartered in South Carolina; have taken actions within Plaintiff's jurisdictional boundaries that have foreseeably caused injury to Plaintiff; and/or have the requisite minimum contacts with South Carolina and Lexington County necessary to constitutionally permit the Court to exercise jurisdiction.

14.    Plaintiff has declared, inter alia, that opioid abuse, addiction, morbidity, and mortality has created a serious public health and safety crisis and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

15.    Venue is proper in Lexington County pursuant to S.C. Code Ann. § 15-7-20; S.C. Code Ann. § 15-7-30; and S.C. Code Ann. § 39-5-50; as the transactions and occurrences that form the basis for this Complaint occurred in Lexington County.

16.    This action is non-removable because there is incomplete diversity of residents and no substantial federal question is presented.

## PARTIES

17.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

18.    Lexington County, is a body politic in the State of South Carolina. It is among the largest counties in South Carolina by population, with approximately 290,642 residents.

19.    Defendant Purdue Pharma L.P. ("PPL") is a limited partnership organized under the laws of the State of Delaware with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901.

20.    Defendant Purdue Pharma Inc. ("PPI") is a New York corporation with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford,

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Connecticut 06901.

21.    Defendant The Purdue Frederick Company, Inc. ("PFC") is a New York corporation with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901.

22.    PPL, PPI, and PFC (collectively, "Purdue") are engaged in the manufacture, promotion, distribution, and sale of opioids nationally and in Lexington County, including OxyContin (Oxycodone hydrochloride extended release), MS Contin (Morphine sulfate extended release), Dilaudid (Hydromorphone hydrochloride), Dilaudid-HP (Hydromorphone hydrochloride), Butrans (Byrenorpine), Hysingla ER (Hyrdrocodone bitrate), and Targiniq ER (Oxycdone hydrocholoride and Naloxone hydrochloride), all of which except Butrans are Schedule II of the Controlled Substances Act ("CSA"). Purdue is subject to a Consent Judgment in South Carolina dated May 15, 2007.

23.    OxyContin is Purdue's largest-selling opioid. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (i.e., painkillers).

24.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva USA is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation with its United States Headquarters located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

25.    Defendant Cephalon, Inc. is a Delaware corporation with its headquarters at 1090 Horsham Road, North Wales, Pennsylvania 19454. In 2011, Teva Ltd. acquired Cephalon, Inc.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

26.     Teva USA and Cephalon, Inc. (collectively, "Cephalon") work together to manufacture, promote, distribute and sell both brand name and generic versions of the opioids nationally and in Lexington County, including Actiq (Fentanyl citrate) and Fentora (Fentanyl citrate tablet), both Schedule II drugs.

27.     Teva USA was in the business of selling generic opioids, including a generic form of OxyContin from 2005 to 2009 nationally and in Lexington County.

28.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its headquarters located at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey, 08933.

29.     Defendant Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals") is a Pennsylvania corporation that registered its headquarters with the Pennsylvania Department of State at 1125 Bear Harbor Road, Titusville, New Jersey, 08560 and is a wholly owned subsidiary of J&J.

30.     Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc.

31.     Defendant Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation that registered its headquarters with the Pennsylvania Department of State at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

32.     Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation that registered its headquarters with the Pennsylvania Department of State at 1125 Bear Harbor Road, Titusville, New Jersey, 08560.

33.     J&J is the only company that owns more than 10% of Janssen Pharmaceuticals stock. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals drugs and Janssen Pharmaceuticals profits inure to J&J's benefit.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

34.    J&J, Janssen Pharmaceuticals, OMP, and Janssen Pharmaceutica (collectively, "Janssen") are or have been engaged in the manufacture, promotion, distribution, and sale of opioids nationally and in Lexington County, including Duragesic (Fentanyl), Nucynta (Tapentadol), and Nucynta ER (Tapentadol extended release), all of which are Schedule 2 drugs.

35.    Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

36.    Defendant Endo Health Solutions Inc. ("EHS") is a Delaware corporation with its headquarters at 1400 Atwater Drive, Malvern, Pennsylvania 19355.

37.    Defendant Endo Pharmaceuticals, Inc. ("EPI") is a wholly owned subsidiary of EHS and is a Delaware corporation with its headquarters at 1400 Atwater Drive, Malvern, Pennsylvania.

38.    EHS and EPI (collectively, "Endo") manufacture, promote, distribute and sell opioids nationally and in Lexington County, including Opana ER (Oxymorphone hydrochloride extended release), Opana (Oxymorphone hydrochloride), Percodan (Oxymorphone hydrochloride and aspirin), and Percocet (Oxymorphone hydrochloride and acetaminophen).

39.    Opioids make up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded revenue of $1.15 billion from 2010 to 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids, both directly and through its subsidiary, Qualitest Pharmaceuticals, Inc., including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

40.    Allergan Plc is a public limited liability company incorporated in Ireland with its principal place of business at Clonshaugh Business & Technology Park, Coolock, Dublin 17. Actavis Plc acquired Allergan Plc in March 2015, and the combined company changed its name

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

to Allergan Plc in March 2015.

41.    Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012; the combined company changed its name to Actavis, Inc. in January 2013. Actavis, Inc.'s headquarters are located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

42.    Watson Laboratories, Inc. is a Nevada corporation with its headquarters at 132 Business Center Drive, Corona, California and is a wholly owned subsidiary of Allergan Plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).

43.    Actavis Pharma, Inc. f/k/a Actavis, Inc. is a Delaware corporation with its headquarters at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054, and was formerly known as Watson Pharma, Inc.

44.    Actavis LLC is a Delaware limited liability company with its headquarters at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey.

45.    Each of the defendants in preceding four paragraphs is owned by Allergan Plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan Plc exercises control over these marketing and sales efforts; profits from the sale of Allergan/Actavis products; and ultimately benefits from them (Allergan Plc, Actavis Plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter collectively are referred to as "Actavis.").

46.    Actavis manufactures, promotes, distributes, and sells the branded opioids Kadian (morphine sulfate extended release) and Norco nationally and within Lexington County. Kadian is a Schedule II drug. Actavis also sells a generic version of Kadian, Duragesic, and Opana.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008 and began marketing Kadian in 2009.

47.    Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.

48.    Insys has manufactured, promoted, distributed, and sold the branded Schedule II opioid Subsys (fentanyl sublingual spray) since 2012, both nationally and within Lexington County, South Carolina. According to its Form 10-K filing for 2015, Insys reported revenues of $329.5 MM from the sales of Subsys. Although Subsys was approved solely for treatment of breakthrough pain ("BTP") in cancer patients already receiving opioids for persistent cancer-related pain, Insys illegally and deceptively marketed and promoted Subys for chronic pain conditions.

49.    Defendant McKesson Corporation ("McKesson") is a Delaware corporation with its headquarters at One Post Street, San Francisco, California, 94104.

50.    McKesson promotes, distributes, and sells opioids manufactured by Manufacturers across the country and, upon information and belief, within South Carolina and Lexington County to pharmacies and institutional providers. It had a net income over $1.5 Billion in 2015.

51.    Defendant Cardinal Health Inc. ("Cardinal") is an Ohio Corporation with its headquarters at 7000 Cardinal Place, Dublin, Ohio, 43017.

52.    Defendant Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including, on information and belief, South Carolina and Lexington County.

53.    Defendant Rite Aid of South Carolina, Inc., ("Rite Aid") was incorporated in

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

South Carolina in 1977 and has various locations throughout South Carolina, including within Lexington County, and acts as a subsidiary of Rite Aid Corporation.

54.    Defendant Rite Aid distributes opioids to consumers within South Carolina and Lexington County.

55.    Defendant CVS Pharmacy, Inc. was incorporated in Rhode Island and is registered to do business in South Carolina and distributes opioids to consumers within South Carolina and Lexington County.

56.    Defendant CVS Health Corporation is incorporated in Delaware and serves as the parent corporation for CVS Pharmacy, Inc. (Collectively, "CVS"). Its headquarters are at One CVS Drive, Woonsocket, Rhode Island 02895.

57.    Upon information and belief, Defendant AmerisourceBergen Drug Corporation ("Amerisource") is a Delaware Corporation with its headquarters at 1300 Morris Drive, Chesterbrook, Pennsylvania, 19087.

58.    Defendant Amerisource does substantial business as a pharmaceutical distributor to retail pharmacies and institutional providers in the State of South Carolina and Lexington County.

59.    The Distributor Defendants failed to detect and report actions by the Physician Defendants, and others similarly situated, which caused the opioid epidemic plaguing Lexington County. The data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. All potential Distributor Defendants conceal and prevent their discovery of necessary information to confirm their identities. Neither the DEA nor the wholesale distributors will voluntarily disclose the data necessary to identify with specificity the transactions which will for the evidentiary basis for

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

naming all Distributor Defendants responsible.

60.    Upon information and belief, three of the Distributor Defendants, Cardinal, Amerisource, and McKesson are three of the largest opioid distributors in Lexington County.

61.    Defendant LeAvis Sullivan is a resident and citizen of South Carolina. During the relevant time period, Defendant Sullivan was the District Manager for defendant Purdue Pharma, L.P. in South Carolina.

62.    Upon information and belief, Defendant Mark Waldrop is a resident and citizen of Lexington County, South Carolina. During the relevant time period, Defendant Waldrop was the Territory Business Manager for defendant Purdue Pharma, L.P. in Lexington County, South Carolina, and surrounding areas.

63.    Aathirayen Thiyagarajah is, ostensibly, a physician licensed to practice medicine in South Carolina and has his primary place of business in South Carolina, is a citizen of South Carolina, and dedicates a large portion of his practice to prescribing opioid medications for nonmedical purposes. Defendant Thiyagarajah distributed and dispensed opioids outside the usual course and scope of professional practice and not for a legitimate medical purpose. His actions have led to opioids being sold illegally in Spartanburg County, South Carolina and have led to overdoses within Spartanburg County. He greatly contributed to the diversion of opioids across South Carolina and into Lexington County, causing great economic loss to Plaintiff.

64.    Pain and Spine Consultants, PA, is a South Carolina legal entity which, ostensibly, operates as a medical provider in South Carolina. This clinic defendant is operated by, employs, and/or is affiliated with Defendant Thiyagarajah. The acts and/or omissions of this clinic defendant greatly contributed to the illegal diversion of opioids across South Carolina and Lexington County, and opioids placed into the public by this clinic defendant directly resulted in

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

overdoses and diversion of opioids, causing great economic loss to Plaintiff.

65.    John Doe 1 and John Doe 2 are physicians licensed to practice medicine in South Carolina, have their primary place of business in South Carolina, are citizens of South Carolina, and dedicate a large portion of the practice to prescribing opioid medications. On information and belief, these physicians distributed and dispensed opioids not for a legitimate medical purpose. Their actions have led directly to opioids being sold illegally in Lexington County, South Carolina and to overdoses within Lexington County. They greatly contributed to the diversion of opioids across South Carolina and in Lexington County causing great economic loss to Plaintiff. Once the Complaint is filed and initial limited discovery is held, John Doe 1 and John Doe 2 will be named through the appropriate motion to amend this initial Complaint.

66.    Clinic 1 and Clinic 2 are South Carolina Legal Entities which ostensibly operate as medical providers in Lexington County and elsewhere in South Carolina. The Clinic Defendants are operated by, employ, and/are affiliated with the Doe Defendants. The Clinic Defendants' acts and/or omissions greatly contribute to the illegal diversion of opioids across South Carolina and Lexington County, and opioids placed into the public by the Clinic Defendants directly result in overdoses and diversion of opioids within Lexington County, causing great economic loss to Plaintiff.

## GENERAL FACTUAL ALLEGATIONS

67.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

## A. THE PAIN-RELIEVING AND ADDICTIVE PROPERTIES OF OPIOIDS

68.    The pain-relieving properties of opium have been recognized for millennia.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Likewise, the magnitude of opium's potential for abuse and addiction has been well-known for ages and has led to its strict regulation world-wide. Opioids, similar to the illegal drugs opium and heroin, are substances that act on opioid receptors to produce morphine-like effects.

69.     During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve pain – particularly on the battlefield – and they were popularly used in a wide variety of commercial products ranging from pain elixirs to cough suppressants to beverages. By 1900, an estimated 300,000 people were addicted to opioids in the United States,[1] and many doctors prescribed opioids solely to avoid patients' withdrawal. Both the numbers of opioid addicts and the difficulty in weaning patients from opioids made clear their highly addictive nature.

70.     Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," as the result of an excessive dose.

71.     Studies and articles from the 1970s and 1980s also made clear the reasons to avoid opioids: Scientists observed negative outcomes from long-term opioid therapy in pain management programs; opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed a tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due to the side effects of opioids; and addiction. Leading authorities discouraged, or even prohibited, the use of opioid therapy for chronic pain.

---

[1] Substance Abuse and Mental Health Services Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, Treatment Improvement Protocol (TIP Services), No. 43 (2005).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

72.    In 1986, Dr. Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[2]

73.    Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> *The traditional approach to chronic non-malignant pain does not accept the long- term administration of opioid drugs.* This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*[3]

According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[4]

74.    For all the reasons outlined by Dr. Portenoy, and in the words of one researcher from the University of Washington in 2012, and quoted by a Harvard researcher the same year,

---

[2] R. Portenoy & K. Foley, Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases, 25(2) Pain 171 (1986).
[3] R. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields and J.C. Liebeskind eds., 1994) (emphasis added).
[4] *Id.*

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

"it did not enter [doctors'] minds that there could be a significant number of chronic pain patients who were successfully managed with opioids, because if there were any, we almost never saw them."[5]

75.    Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

76.    When under the continuous influence of opioids over time, patients grow tolerant to their analgesic effects. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same levels of pain reduction to which he has become accustomed – up to and including doses that are "frighteningly high."[6] At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction. A patient can take the opioids at the continuously escalating dosages to match pain tolerance and still overdose at recommended levels.

77.    Opioids vary by duration. Long-acting opioids, such as Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours.

---

[5] J. Loeser. Five crises in pain management, Pain Clinical Updates. 2012;20 (1):1–4(cited by I. Kissin, Long-term opioid treatment of chronic nonmalignant pain: unproven efficacy and neglected safety? 6 J. Pain Research 513, 514 (2013)).

[6] M. Katz, Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith, 170(16) Archives of Internal Med. 1422 (2010).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

78.    Defendants promoted the idea that pain should be treated by taking long- acting opioids continuously and supplementing them by also taking short-acting, rapid- onset opioids for episodic pain.

79.    In 2013, in response to a petition to require manufacturers to strengthen warnings on the labels of long-acting opioid products, the FDA warned of the "grave risks" of opioids, including "addiction, overdose, and even death." The FDA further warned, "[e]ven proper use of opioids under medical supervision can result in life- threatening respiratory depression, coma, and death." Because of those grave risks, the FDA said that long-acting or extended release opioids "should be used only when alternative treatments are inadequate."[7] The FDA required that – going forward – opioid makers of long-acting formulations clearly communicate these risks in their labels.

80.    In 2016, the FDA expanded its warnings for immediate-release opioid pain medications, requiring similar changes to the labeling of immediate-release opioid pain medications as it had for extended release opioids in 2013. The FDA also required several additional safety-labeling changes across all prescription opioid products to include additional information on the risk of these medications.[8]

81.    The facts on which the FDA relied in 2013 and 2016 were well known to Defendants in the 1990s when their deceptive marketing began.

## B. OPIOID THERAPY MAKES PATIENTS SICKER WITHOUT LONG TERM BENEFITS

---

[7] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA- 2012-P-0818 (Sept. 10, 2013) (emphasis in original).

[8] FDA announces enhanced warnings for immediate-release opioid pain medications related to risks of misuse, abuse, addiction, overdose and death. Available at http://www.fda.gov/newsevents/newsroom/pressannouncements/ucm491739.htm (accessed June 15, 2018).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

82.     There is no scientific evidence supporting the safety or efficacy of opioids for long-term use. Defendants are well aware of the lack of such scientific evidence. While promoting opioids to treat chronic pain, Defendants failed to disclose the lack of evidence to support their use long-term and have intentionally failed to disclose the substantial scientific evidence demonstrating that chronic opioid therapy actually worsens patients' health.

83.     There are no controlled studies of the use of opioids beyond 16 weeks, and no evidence that opioids improve patients' pain and function on a long-term basis. For example, a 2007 systematic review of opioids for back pain concluded that opioids have limited, if any, efficacy for back pain and that evidence did not allow judgments regarding long-term use.

84.     Substantial evidence exists that opioid drugs are ineffective to treat chronic pain, and actually worsen patients' health. For example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments.[9]

85.     Increasing duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (including depression, anxiety, post-traumatic stress disorder, or substance abuse), increased psychological distress, and greater health care utilization.

86.     Although opioids may work acceptably well during a limited, short period of time, long-term usage results in marked declines in patient's ability to function, their general health, mental health, and social function. Over time, even high doses of potent opioids often fail

---

[9] A. Furlan *et al.*, *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Can. Med. Ass'n J. 1589 (2006). This same study revealed that efficacy studies do not typically include data on opioid addiction. In many cases, patients who may be more prone to addiction are pre-screened out of the study pool. This does not reflect how doctors actually prescribe the drugs, because even patients who have past or active substance use disorders tend to receive higher doses of opioids. K. Seal, *Association of Mental Health Disorders With Prescription Opioids and High- Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. Am. Med. Ass'n 940 (2012).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

to control pain, and patients exposed to such doses are unable to function normally.[10]

87.    The foregoing is true both generally and for specific pain-related conditions. Studies of the long-term use of opioids for chronic lower back pain have failed to demonstrate an improvement in patients' function. Instead, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not permit patients to return to work or physical activity. This failure is due in part to addiction and other side effects.

88.    For example, as many as 30% of patients who suffer from migraines have been prescribed opioids to treat their headaches. Users of opioids had the highest increase in the number of headache days per month, scored significantly higher on the Migraine Disability Assessment, and had higher rates of depression, compared to non-opioid users. A survey by the National Headache Foundation found that migraine patients who used opioids were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other, non-opioid medications.

## C. DEFENDANTS' SCHEME TO CHANGE PRESCRIBER HABITS AND PUBLIC PERCEPTION

89.    Prior to the Defendants' marketing campaign complained of herein, generally accepted standards of medical practice dictated that opioids should only be used on a short-term, temporary basis in order to treat acute pain, pain relating to recovery from surgery, or for cancer or palliative care. In those limited instances, the risks of addiction are considered low or of little significance.

90.    By its very nature, the market for short-term pain relief is significantly more limited than the market for long-term chronic pain relief. Defendants recognized that if they

---

[10] *See* A. Rubenstein, *Are we making pain patients worse?* Sonoma Medicine (Fall 2009).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

could sell their opioid products for both short term pain relief and for the treatment of long-term, chronic pain, they could achieve blockbuster levels of sales while exponentially increasing their profits. Further, Defendants recognized that the elevated risk of addiction associated with the long-term use of their highly-addictive, opioid products virtually guarantee that their blockbuster profits would continue indefinitely.

91.    Defendants knew that to increase their profits from the sale of opioids they would need to convince doctors and patients that long-term opioid therapy was safe and effective. In other words, Defendants needed to persuade physicians to abandon their long-held apprehensions about prescribing opioids, and instead to prescribe opioids for durations previously understood to be unsafe.

92.    Defendants knew that their goal of increasing profits by promoting the prescription of opioids for chronic pain would lead directly to an increase in health care costs for patients, health care insurers, and health care payors such as Plaintiff.

93.    Marshalling help from consultants and public relations firms, Defendants developed and executed a common strategy to reverse the long-settled understanding of the relative risks and benefits of chronic opioid therapy. Rather than add to the collective body of medical knowledge concerning the best ways to treat pain and improve patient quality of life, however, Defendants instead sought to distort and pervert medical and public perception of existing scientific data.

94.    As explained more fully herein, Defendants, collectively and individually, poured vast sums of money into generating articles, continuing medical education courses ("CMEs"), and other "educational" materials, conducting sales visits to individual doctors, and supporting a network of professional societies and advocacy groups, which was intended to, and which did,

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

create a new but patently false "consensus" supporting the long-term use of opioids.

## D. DEFENDANTS USED "UNBRANDED" MARKETING TO EVADE REGULATIONS AND CONSUMER PROTECTION LAWS.

95.     Pharmaceutical companies' promotional activity can be branded or unbranded; unbranded marketing typically focuses on education regarding a particular disease state or treatment rather than promoting a specific drug product. By using unbranded marketing in its communications, drug companies avoid the extensive regulatory framework governing branded communications.

96.     A drug company's branded marketing, which identifies and promotes a specific drug, must: (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material omissions; and (c) fairly balance the drug's benefits and risks.[11] The regulatory framework governing the marketing of specific drugs reflects a public policy designed to ensure that drug companies, which are best suited to understand the properties and effects of their drugs, are responsible for providing prescribers with the information they need to accurately assess the risks and benefits of prescribing those drugs to their patients.

97.     Further, the Federal Food, Drug, and Cosmetic Act ("FDCA") places additional restrictions on branded marketing. It prohibits the sale, in interstate commerce, of drugs that are "misbranded." A drug is "misbranded" if it lacks "adequate directions for use" or if the label is false or misleading "in any particular."[12] "Labeling" includes more than the drug's physical label; it also includes "all . . . other written, printed, or graphic matter . . . accompanying" the drug, including promotional material.[13] The term "accompanying" is interpreted broadly to

---

[11] 21 U.S.C. 352(a); 21 CFR 202.1(e)(6); 21 CFR 202.1(e)(3); 21 CFR 1.21(a)
[12] 21 U.S.C 352(f); 21 U.S.C. 352(q); *U.S. v. Sullivan*, 68 S.Ct. 331, 335 (1948)
[13] 21 U.S.C.A. § 321(m)

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

include promotional materials – posters, websites, brochures, books, and the like – disseminated by or on behalf of the manufacturer of the drug.[14] Thus, Defendants' promotional materials are part of their drugs' labels and are required to be accurate, balanced, and not misleading.

98.    Branded promotional materials for prescription drugs must be submitted to the FDA when they are first used or disseminated. If, upon review, the FDA determines that a drug's marketing materials are misleading, it can issue either an untitled letter or a warning letter. The FDA uses untitled letters for violations such as overstating the effectiveness of the drug or making claims without context or balanced information. Warning letters address promotions involving safety or health risks and indicate the FDA may take further enforcement action.

99.    Defendants generally avoided using branded advertisements to spread their deceptive messages and claims regarding opioids. Defendants intentionally avoided branded promotional materials for the express purpose of escaping regulatory review of their claims.

100.    Instead, Defendants disseminated much of their false, misleading, imbalanced, and unsupported statements through unregulated and unbranded marketing materials – materials that generally promoted opioid use but did not name a specific opioid while doing so. Through these unbranded materials, Defendants presented information and instructions concerning opioids generally that were false and misleading.

101.    By acting through third parties, Defendants were able to give the false appearance that their messages reflected the views of independent third parties. Later, Defendants would cite to these sources as "independent" corroboration of their own statements. Further, as one physician adviser to Defendants noted, third-party documents had not only greater credibility, but also broader distribution, as doctors did not "push back" at having materials, for example,

---

[14] *Kordel v. U.S.*, 69 S. Ct. 106, 110 (1948)

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

from the non-profit American Pain Foundation ("APF") on display in their offices, as they would with drug company pieces.

102.    As part of their marketing scheme, Defendants spread and validated their deceptive messages through the following unbranded vehicles ("the Vehicles"): (i) so-called "key opinion leaders" (*i.e.,* Physicians, named as defendants in this lawsuit, who influence their peers' medical practice, including but not limited to prescribing behavior) ("KOLs"), who wrote favorable journal articles and delivered supportive CMEs; (ii) a body of biased and unsupported scientific literature, ghostwritten by Manufacturer Defendants and published by KOLs named as defendants in this lawsuit; (iii) treatment guidelines ghostwritten by Manufacturer Defendants and published as a direct result of KOLs named as defendants in this lawsuit, which were distributed within Lexington County causing injury within the County; (iv) CMEs by KOLs named as defendants in this lawsuit, deliberately conducted within South Carolina, attended by Lexington County Physicians, causing tortious injury within the County; and (v) unbranded patient education materials disseminated within South Carolina and Lexington County through groups purporting to be patient-advocacy and professional organizations ("Front Groups"), which were deliberately influenced by Defendant-controlled KOLs named as Defendants in this lawsuit, the Physicians exercising their influence both directly and indirectly because they served in leadership roles in these organizations.

103.    Defendants disseminated many of their false, misleading, imbalanced and unsupported messages through the Vehicles because they appeared to uninformed observers to be independent. Through unbranded materials, Defendants presented information and instructions concerning opioids generally that were false and misleading.

104.    Even where such unbranded messages were disseminated through third-party

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Vehicles, including the KOLs named as defendants in this lawsuit, Defendants adopted these messages as their own when they cited to, edited, approved, and distributed such materials all Defendants knew were false, misleading, unsubstantiated, unbalanced, and incomplete from the very outset of the message's "creation" by the purportedly independent, KOLs. As described herein, Defendants' sales representatives distributed third-party marketing material to Defendants' target audience that was deceptive.

105.    Defendants took an active role in writing, guiding, reviewing, and approving many of the misleading statements issued by third parties, including the KOLs' statements, ensuring that Defendants were consistently in control of their content. By funding, directing, editing, and distributing these materials, Defendants exercised control over their deceptive messages and acted in concert with these third parties to fraudulently promote the use of opioids for the treatment of chronic pain. The process described in this paragraph is commonly referred to as "Ghostwriting."

106.    The unbranded marketing materials that Defendants assisted in creating and distributing either did not disclose the risks of addiction, abuse, misuse, and overdose, or affirmatively denied or minimized those risks. All of these unbranded marketing materials were promoted by the KOLs falsely from the very outset as independent statements. The KOLs' false promotion of independence provided the unbranded marketing materials utilized by Manufacturer Defendants the credibility required to fraudulently induce physicians within South Carolina and Lexington County to prescribe opioids for chronic pain.

a. *Manufacturer Defendants' Misuse of KOLs*

107.    The Manufacturer Defendants cultivated a select circle of doctors, the named Physicians in this lawsuit, who were chosen and sponsored by Manufacturer Defendants solely

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

because they promoted the aggressive treatment of chronic pain with opioids in return for the payment of vast sums of money by the Manufacturer Defendants. As set forth herein and as depicted in Exhibit A, the pro-opioid Physicians have been at the hub of Defendants' promotional efforts, presenting the appearance of unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain. These pro-opioid KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of opioid therapy for chronic pain. They have served on committees that developed treatment guidelines that strongly encouraged the use of opioids to treat chronic pain and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Defendants were able to exert control of each of these modalities through the KOLs Physicians, each of whom accepted money to promote the false marketing claims of Defendants.

108.    In return for their successful pro-opioid advocacy, KOLs received money, prestige, recognition, research funding, and avenues to publish. The more successful the KOLs' deceptive promotion of Opioids for Chronic Pain, the more they were able to receive from the Manufacturer Defendants.

109.    Defendants cited and promoted the KOLs and studies or articles by the KOLs to broaden the chronic opioid therapy market. By contrast, Defendants did not support, acknowledge, or disseminate the publications of truly independent doctors critical of the use of chronic opioid therapy.

110.    Defendants carefully vetted their KOLs to ensure that they would remain on-message and supportive of the agenda to falsely promote Opioids as safe for the treatment of Chronic Pain. Defendants also kept close tabs on the content of the materials published by the

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

KOLs , if not authoring, editing, and/or revising them in their entirety prior to publication.

111.    In their promotion of the use of opioids to treat chronic pain, the KOLs knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves and Defendants.

b. *Defendants' Corruption of Scientific Literature through KOLs*

112.    Rather than actually test the safety and efficacy of opioids for long- term use, Defendants, instrumentally relying on KOLs, led physicians, patients, and health care payors to believe that such tests had already been done. As set forth herein, Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was likely to shape the perceptions of prescribers, patients, and payors. This literature was, in fact, marketing material intended to persuade doctors and consumers that the benefits of long- term opioid use outweighed the risks.

113.    To accomplish their goal, Defendants – sometimes through third-party consultants and/or front groups – commissioned, edited, and arranged for the placement of favorable articles in academic journals authored by KOLs.

114.    Defendants' plans for these materials did not originate in the departments within the Defendant organizations that were responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients; rather, they originated in Defendants' marketing departments and with Defendants' marketing and public relations consultants, ultimately being published and promoted by KOLs.

115.    In these materials, Defendants (and/or their KOL surrogates) often claimed to rely on "data on file" or presented posters, neither of which are subject to peer review. Still,

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Defendants presented these materials to the medical community as scientific articles or studies, despite the fact that Defendants' materials were not based on reliable data and subject to the scrutiny of others who are experts in the same field.

116.    Defendants also made sure that favorable articles were disseminated and cited widely in the medical literature and by KOL Defendants, even when Defendants and KOLs knew that the articles distorted the significance or meaning of the underlying study. Most notably, Purdue frequently cited a 1980 item in the well-respected New England Journal of Medicine, J. Porter & H. Jick, *Addiction Rare in Patients Treated with Narcotics*, 302 (2) New Eng. J. Med. 123 (1980) ("Porter & Jick Letter"), in a manner that makes it appear that the item reported the results of a peer reviewed study. It also cited two CME programs sponsored by Endo where KOLs were presenters. Defendants and the KOLs acting on their behalf failed to reveal that this "article" was actually a letter-to-the-editor, not a study, much less a peer-reviewed study. The letter, reproduced in full below, states that the authors examined their files of hospitalized patients who had received opioids:

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

## ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154          Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

117.    The patients referred to in the letter were all treated prior to the letter, which was published in 1980. Because of standards of care prior to 1980, the treatment of those patients with opioids would have been limited to acute or end-of-life situations, not chronic pain, making the data useless for any generalization regarding the safety or efficacy of Opioids for treating chronic pain.. Even aside from chronic pain treatment, the letter notes that when these patients' records were reviewed, the authors found almost no references to signs of addiction, though there is no indication that caregivers were instructed to look for, assess, or document signs of addiction. Nor, indeed, is there any indication whether the patients were followed after they were discharged from the hospital or, if they were followed, for how long. None of these serious limitations were disclosed when Defendants and KOLs on their behalf cited the letter, typically as the sole scientific support for the proposition that opioids are rarely addictive.

118.    Dr. Jick has complained that his letter has been distorted and misused – as indeed it has.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

119.    Defendants worked to not only create and promote favorable studies in the literature with the complicity of KOLs, but to discredit or suppress negative information. Defendants' studies and articles often targeted articles that contradicted Defendants' claims or raised concerns about chronic opioid therapy. In order to do so, Defendants – often with the help of KOLs – used a broad range of media to get their message out, including negative review articles, letters to the editor, commentaries, case-study reports, and newsletters.

120.    Defendants' strategy, often through the KOLs – to plant and promote supportive literature and then to cite the pro-opioid evidence in their promotional materials, while failing to disclose evidence that contradicted those claims –  was flatly inconsistent with their legal obligations. The strategy was intended to alter, and did alter, prescribing and consumer patterns, including those of Lexington County, by distorting the truth regarding the risks and benefits of opioids for chronic pain relief.

c.  *Defendants' Misuse of Treatment Guides*

121.    Treatment guidelines authored as a result of KOLs' influence but at the direction of Manufacturer Defendants have been particularly important in securing acceptance for chronic opioid therapy. The guidelines are relied upon by doctors, especially the general practitioners and family doctors targeted by Defendants, who are generally not experts, and who generally have no special training, in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but also are cited throughout scientific literature and relied on by third-party payors in determining whether they should pay for treatments for specific indications.

i.  FSMB

122.    The Federation of State Medical Boards ("FSMB") is a trade organization

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians. The FSMB finances opioid- and pain-specific programs through grants from Defendants.

123.    Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 edition of the guidelines, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies" and taught that opioids were "essential" for the treatment of chronic pain, including as a first prescription option, rather than that opioids could be appropriate in limited cases after other treatments had failed. A 2004 iteration of the 1998 Guidelines and the 2007 book, Responsible Opioid Prescribing, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including in Lexington County.

124.    A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including those in Lexington County.

125.    The publication of *Responsible Opioid Prescribing* was backed largely by drug manufacturers. In all, 163,131 copies of Responsible Opioid Prescribing were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the book as the "leading continuing medical education (CME) activity for prescribers of opioid medications."

126.    In 2007, for example, Cephalon sponsored and distributed through its sales

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

representatives FSMB's *Responsible Opioid Prescribing*, which was drafted by Dr. Fishman. Dr. Fishman was frequently hired by a consulting Firm, Conrad & Associates LLC, to write pro-opioid marketing pieces disguised as science. Dr. Fishman's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

127.    *Responsible Opioid Prescribing* was a signature piece of Dr. Fishman's work and contained a number of deceptive statements. This publication claimed that, because pain had a negative impact on a patient's ability to function, relieving pain—alone—would "reverse that effect and improve function." However, the truth is far more complicated; functional improvements made from increased pain relief can be offset by a number of problems, including addiction.

128.    Defendants relied on 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

ii.  AAPM/APS GUIDELINES

129.    American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement that endorsed

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.[15] The Chair of the committee that issued the statement, Dr. J. David Haddox, was at the time a paid speaker for Purdue. The sole consultant to the committee was Defendant Portenoy. The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website.

130.    AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the 2009 Guidelines, including KOL, Dr. Portenoy and Dr. Perry Fine, received support from Defendants Janssen, Cephalon, Endo, and Purdue.

131.    The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. The 2009 Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; they were reprinted in the *Journal of Pain*, have been cited hundreds of times in academic literature, were disseminated in Lexington County during the relevant time period, and were and are available online.

132.    Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions.

iii. GUIDELINES THAT DID NOT RECEIVE DEFENDANTS' SUPPORT

133.    The extent of Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines – the authors of which did not accept drug company funding

---

[15] Haddox J., et al., The Use of Opioids for the Treatment of Chronic Pain – A Consensus Statement from the American Academy of Pain Medicine and the American Pain Society, 6(1) Pain Forum 77-79 (1997)

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

– reached very different conclusions.

134.    The 2012 Guidelines for Responsible Opioid Prescribing in Chronic Non- Cancer Pain, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvements in physical and functional status and minimal adverse effects."[16]

135.    Similarly, the 2011 Guidelines for the Chronic Use of Opioids, issued by the American College of Occupational and Environmental Medicine, recommend against the "routine use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence."[17]

136.    The Clinical Guidelines on Management of Opioid Therapy for Chronic Pain, issued by the U.S. Department of Veterans Affairs ("VA") and Department of Defense ("DOD")

---

[16] Laxmaiah Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment*, 15 Pain Physician (Special Issue) S1-S66; *Part 2 – Guidance*, 15 Pain Physician (Special Issue) S67-S116 (2012).
[17] *American College of Occupational and Environmental Medicine's Guidelines for the Chronic Use of Opioids* (2011).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

in 2010, notes that their review revealed a lack of solid evidence-based research on the efficacy of long-term opioid therapy.[18]

### d. *Defendants' Misuse of CMEs*

137.    A CME is a professional education program provided to doctors. Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure. These programs are delivered in person, often in connection with professional organizations' conferences, and online, or through written publications. Doctors rely on CMEs not only to satisfy licensing requirements, but also to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because KOLs, including those named as defendants in this case, typically teach CMEs, and are highly respected in their fields and thought to reflect these physicians' medical expertise, they can be especially influential with doctors. In fact, the KOLs used CMEs in South Carolina to influence the prescribing habits of doctors within South Carolina and Lexington County, ultimately inducing Lexington County to provide health insurance for its workforce that allowed the prescribing of Opioids for chronic pain and lost revenue.

138.    The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation. As one target, Defendants, through KOLs, aimed to reach general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions.

---

[18] Management of Opioid Therapy for Chronic Pain Working Group, VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010). Available at https://www.va.gov/painmanagement/docs/cpg_opioidtherapy_fulltext.pdf (accessed June 15, 2018).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

139.    Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain, focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids, and frequently omitted or downplayed their risks and adverse effects.

140.    The American Medical Association ("AMA") has recognized that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."[19]

141.    Lastly, KOL Dr. Fine authored a CME, sponsored by Cephalon, titled *Opioid-Based Management of Persistent and Breakthrough Pain*, with KOLs Dr. Christine A. Miaskowski, M.D., and Michael J. Brennan, M.D. Cephalon paid to have this CME published in a supplement of Pain Medicine News in 2009.[140] It instructed prescribers that "clinically, broad classification of pain syndromes as either cancer or non-cancer related has limited utility," and recommended dispensing "rapid onset opioids" for "episodes that occur spontaneously" or unpredictably, including "oral transmucosal fentanyl," Actiq, and "fentanyl buccal table," Fentora, including in patients with chronic non-cancer pain. Dr. Miaskoski disclosed in 2009, in connection with the APS/AAPM Opioid Treatment Guidelines, that she served on Cephalon's speaker's bureau.[20] Dr. Fine also received funding from Cephalon for consulting services.

142.    Lexington County physicians attended or reviewed Defendants' sponsored CMEs

---

[19] Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011).
[20] 14 of 21 panel members who drafted the AAPM/APS Guidelines received support from Janssen, Cephalon, Endo, and Purdue.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

during the relevant time period and were misled by them.

143.    By sponsoring CME programs put on by Front Groups like APF, AAPM and others, Defendants could rely upon instructors to deliver messages favorable to them, as these organizations were dependent on Defendants for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids. Producers of CMEs and Defendants measure the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

e. *Defendants' Misuse of Patient Education Materials and Front Groups*

144.    Pharmaceutical industry marketing experts see patient-focused advertising, including direct-to-consumer marketing, as particularly valuable in "increas[ing] market share . . . by bringing awareness to a particular disease that the drug treats."[21] Physicians are more likely to prescribe a drug if a patient specifically requests it, and physicians' willingness to acquiesce to such patient requests holds true even for opioids and for conditions for which they are not approved.[22] Recognizing this phenomenon, Defendants put their relationships with Front Groups to work to engage in largely unbranded patient education about opioid treatment for chronic pain.

145.    Defendants entered into arrangements with numerous Front Groups (*i.e.*, groups purporting to be patient-advocacy and professional organizations) to promote the prescription of

---

[21] Kanika Johar, *An Insider's Perspective: Defense of the Pharmaceutical Industry's Marketing Practices*, 76 Albany L. Rev. 299, 308 (2013).

[22] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it, compared with 1% of those making no specific request. J.B. McKinlay *et al.*, *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52(2) Med. Care 294 (2014).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

opioids for the treatment of chronic pain. These organizations depend, in some cases exclusively but in all cases largely, upon Defendants for significant funding and, in some cases, for their continued survival. They were involved not only in generating promotional materials and programs for doctors and patients that supported chronic opioid therapy, but they also assisted Defendants' marketing efforts in other ways—for example, by responding to negative articles and advocating against regulatory changes that would constrain opioid prescribing. They developed and disseminated pro-opioid treatment guidelines; conducted outreach to groups targeted by Defendants, such as veterans and the elderly; and developed and sponsored CMEs that focused exclusively on the use of opioids to treat chronic pain. Defendants created a symbiotic relationship with the Front Groups whereby Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages. In turn, the supportive messages drove prescriptions and profits for Defendants and ensured continued funding of the Front Groups.

  i.  AMERICAN PAIN FOUNDATION

146.    The most prominent and effective of Defendants' Front Groups was the American Pain Foundation ("APF"), which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012.

147.    APF issued purported "education guides" for patients, the news media, and policymakers that touted the benefits of opioids for chronic pain treatment and minimized their risks, specifically the risk of addiction. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to "educate" patients about their "right" to pain treatment with opioids. All of the programs and materials were intended to, and did, reach a

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

national audience, including residents of Lexington County.

148.    By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit. APF board member, Dr. Portenoy, explained the lack of funding diversity was one of the biggest problems at APF.

149.    While APF held itself out as an independent patient advocacy organization, it simultaneously engaged in grassroots lobbying against various legislative initiatives that might regulate the prescription of opioids and protect patients from the risks associated with the unnecessary prescription of highly addictive and ineffective drugs. In stark contrast to its stated purpose, APF functioned principally as an advocate for the interests of Defendants, not patients.

150.    In practice, APF operated in close collaboration with Defendants. APF submitted grant proposals seeking to fund activities and publications suggested by Defendants. APF also assisted in marketing projects for Defendants.

151.    The intimate relationship between APF and Defendants demonstrates APF's clear lack of independence in its finances, management, and mission, and its willingness to allow Defendants to control its activities and messages strongly indicates that each Defendant that provided it with funding was able to exercise editorial control over its publications.

152.    In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links - financial and otherwise - between the organization and the manufacturers of opioid painkillers. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to exist, effective immediately."[23]

---

[23] William Heisel, USC Annenberg Center for Health Journalism, Antidote: Investigating Untold Health Stories, *Journalists    Bag    a    Big    One:    The    American    Pain    Foundation*, https://www.centerforhealthjournalism.org/blogs/2012/05/14/journalists-bag-big-one-american-pain-

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

## ii. THE AMERICAN ACADEMY OF PAIN MEDICINE

153.    The American Academy of Pain Medicine ("AAPM"), with the assistance, prompting, involvement, and funding of Defendants, issued the treatment guidelines discussed herein, and sponsored and hosted CMEs essential to Defendants' deceptive marketing scheme.

154.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering CMEs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

155.    The conferences sponsored by AAPM heavily emphasized CME sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs, Dr. Fine, Dr. Portenoy, and Dr. Lynn Webster. Dr. Webster was elected president of AAPM while under a DEA investigation. Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are ... small and can be managed."[24]

---

foundation (accessed June 15, 2018).

[24] *Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine*, Univ. of Cal., Davis (2005), http://www.medscape.org/viewarticle/500829 (accessed June 15, 2018).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

156.    AAPM's staff understood that they and their industry funders were engaged in a common task. Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

## E. DEFENDANTS ACTED IN CONCERT WITH KOLs AND FRONT GROUPS TO CREATE, PROMOTE, AND CONTROL UNBRANDED MARKETING

157.    Like the tobacco companies that engaged in an industry-wide effort to misrepresent the safety and risks of smoking, Defendants worked with each other and with the industry-funded and directed Front Groups and KOLs to carry out a common scheme to deceptively market opioids by misrepresenting the risks, benefits, and superior efficacy of opioids to treat chronic pain.

158.    Defendants acted through and with the same network of Front Groups, funded the same KOLs, and often used the very same language and format to disseminate the same deceptive messages regarding the appropriate use of opioids to treat chronic pain. Despite knowing that this information was false and misleading, Defendants, Front Groups, and KOLs disseminated these misrepresentations nationwide, including to Lexington County prescribers and patients.

159.    One Vehicle for Defendants' marketing collaboration was the Pain Care Forum ("PCF"). PCF began in 2004 as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues." APF President Will Rowe described the forum as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

160.    PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, Janssen, and Purdue); doctors and nurses in the field of pain care;

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

professional organizations (including AAPM, APS, and American Society of Pain Educators); patient advocacy groups (including APF and American Chronic Pain Association ("ACPA")); and other like-minded organizations - almost all of which received substantial funding from Defendants.

161.    PCF, for example, developed and disseminated "consensus recommendations" for a Risk Evaluation and Mitigation Strategy ("REMS") for long-acting opioids that the FDA mandated in 2009 to communicate the risks of opioids to prescribers and patients.[25] This was critical because a REMS that went too far in narrowing the uses or benefits or in highlighting the risks of chronic opioid therapy would undermine Defendants' marketing efforts and adversely affect profits. The recommendations claimed that opioids were "essential" to the management of pain, and that the REMS "should acknowledge the importance of opioids in the management of pain and should not introduce new barriers." Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain, rather than undermine, their deceptive marketing of opioids for chronic pain treatment.

## F. DEFENDANTS' MISREPRESENTATIONS

162.    Defendants, through their own marketing efforts and publications and through their sponsorship and control of patient advocacy and medical societies and projects, caused deceptive materials and information to be placed into the marketplace, including to prescribers, patients, and payors in Lexington County. These promotional messages were intended to and did encourage patients to request, doctors to prescribe, and payors to pay for chronic opioid therapy.

163.    Recognizing that Doctors are the gatekeepers for controlling access to

---

[25] The FDA can require a drug maker to develop a REMS—which could entail (as in this case) an education requirement or distribution limitation—to manage serious risks associated with a drug.

prescription drugs, not surprisingly, Defendants focused the bulk of their marketing efforts and multi-million dollar budgets on the professional medical community. As a controlled substance with significant regulatory barriers limiting access, Defendants knew doctors would not prescribe opioids to patients with common chronic pain complaints unless doctors were convinced that opioids had real benefits and minimal risks. Accordingly, Defendants concealed from prescribers, patients, and the public that evidence in support of their promotional claims was inconclusive, non-existent or unavailable. Instead, each Defendant disseminated misleading and unsupported messages that caused the target audience to believe those messages were corroborated by scientific evidence. As a result, Lexington County doctors began prescribing opioids on a long-term to treat chronic pain – a treatment choice that most if not all never would have considered prior to Defendants' campaign.

164.    Drug company marketing materially impacts doctors' prescribing behavior.[26] Doctors rely on drug companies to provide them with truthful information about the risks and benefits of their products, and they are influenced by their patients' requests for particular drugs and payors' willingness to pay for those drugs. Evidence shows that Doctors who would otherwise not have prescribed opioids were, in fact, induced by Defendants' deceptive marketing to prescribe opioids for chronic pain as a result of Defendants' deceptive marketing.

165.    Defendants spent millions of dollars to market their drugs to prescribers and patients and meticulously tracked their return on that investment. In one recent survey published

---

[26] *See, e.g.*, P. Manchanda & P. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis*, 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); I. Larkin, *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children*, 33(6) Health Affairs 1014 ( 2014) (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* A. Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am J. Pub. Health 221 (2009) (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

by the AMA, 88% of the practitioner respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic non-cancer pain, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities.[27] These results are the direct consequence of Defendants' fraudulent marketing campaign.

166.    As described in detail below, Defendants:

- Misrepresented the truth about how opioids lead to addiction;

- Misrepresented that opioids improve function;

- Misrepresented that addiction risk of opioids can be managed;

- Misled doctors, patients, and payors through the use of misleading terms like "pseudo-addiction;"

- Falsely claimed that withdrawal is simply managed;

- Misrepresented that increased doses pose no significant additional risks to patients;

- Falsely omitted or minimized the adverse effects of opioids and overstated the risks of alternative forms of pain treatment.

167.    Defendants' misrepresentations were aimed at doctors, patients, and payors.

168.    Underlying each of Defendants' misrepresentations and deceptions in promoting the long-term continuous use of opioids to treat chronic pain was Defendants' collective effort to hide from the medical community the fact that there exist no adequate and well-controlled studies of opioid use longer than 12 weeks existed.[28]

a. *Defendants, Acting Individually and Collectively, Misrepresented the Truth About How*

---

[27] Research Letter, Prescription Drug Abuse: A National Survey of Primary Care Physicians, JAMA Intern. Med. (Dec. 8, 2014), E1-E3.
[28] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA- 2012-P-0818 (Sept. 10, 2013).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

*Use of Opioids Leads to Addiction.*

169.    Defendants' fraudulent representation that opioids are rarely addictive is central to Defendants' scheme. Through their well-funded, comprehensive, and aggressive marketing efforts, Defendants succeeded in changing the perceptions of many physicians, patients, and health care payors and persuaded them that opioid addiction rates are low and that addiction is unlikely to develop when opioids are prescribed for chronic pain. As both an intended and foreseeable result, doctors in Lexington County prescribed more opioids to more patients – thereby enriching Defendants.

170.    Each of the Defendants claimed that the potential for addiction from its drugs was relatively small or non-existent, despite the complete lack of supporting scientific evidence.

171.    To wit, Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which fraudulently claimed that addiction is rare and limited to extreme cases of unauthorized dose escalations, opioid prescription fraud, or theft.

172.    Similarly, Endo sponsored a website, www.painknowledge.com, through APF, which falsely claimed that: "[p]eople who take opioids as prescribed usually do not become addicted." Although the term "usually" is not defined, the overall presentation suggests that the rate is so low as to be immaterial. The language also implies that the long-term use of opioids presents minimal risk of addiction to patients if the opioids are properly prescribed by a physician.

173.    Additionally, Endo distributed a patient education pamphlet edited by KOL Dr. Portenoy entitled *Understanding Your Pain: Taking Oral Opioid Analgesics.* It claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems." This implies that patients prescribed opioids for *genuine* pain will not become addicted, a claim which is both unsupported and known to be false.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

174.    Likewise, Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) in conjunction with the AAPM, ACPA and APF , which, as set forth in the excerpt below, described the fact that opioids are addictive as a "myth" and falsely asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."



Although the term "rarely" is not defined, the overall presentation suggests that the rate is so low as to be immaterial. The language also implies that the long-term use of opioids presents minimal risk of addiction to patients if the opioids are properly prescribed by a physician, which is untrue. The guide states as a "fact" that "Many studies" show that opioids are *rarely* addictive when

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

used for chronic pain. In fact, no such studies exist.

175.    For another example, Purdue sponsored and Janssen provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught, "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications," although the term "very unlikely" is not defined, the overall presentation suggests that the rate is so low as to be immaterial.

176.    For another example, Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that less than 1% of children prescribed opioids would become addicted.[29] This publication also falsely asserted that pain is undertreated due to "misconceptions about opioid addiction."

177.    In Addition, in the 1990s, Purdue amplified the pro-opioid message with promotional videos and featuring Dr. Portnoy and other doctors in which it was claimed, "the likelihood that treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low."[30]

178.    As yet another example from the industry, Actavis's strategy and pattern of deceptive marketing is similarly evident in its internal training materials. A sales education module titled "Kadian Learning System" trained Actavis's sales representatives on the marketing messages described above – including deceptive claims about improved function, the risk of addiction, the false scientific concept of "pseudoaddiction," and opioid withdrawal—that sales representatives were directed and required, in turn, to pass on to prescribers, nationally and in

---

[29] In support of this contention, it misleadingly cites a 1996 article by Dr. Kathleen Foley concerning cancer pain.
[30] Excerpts from one such video, including the statement quoted here, may be viewed at http://www.wsj.com/articles/SB10001424127887324478304578173342657044604 (accessed June 15, 2018).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Lexington County.

179.    The sales training module, dated July 1, 2010, includes the misrepresentations documented in this Complaint, starting with its promise of improved function. The sales training instructed Actavis sales representatives that "most chronic benign pain patients do have markedly improved ability to function when maintained on chronic opioid therapy," when, in reality, available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in daily activities like work. The sales training also misleadingly implied that the dose of prescription opioids could be escalated without consequence and omitted important facts about the increased risks of high dose opioids. First, Actavis taught its sales representatives, who would pass the message on to doctors, that pain patients would not develop tolerance to opioids, which would have necessitated increasing doses: "Although tolerance and dependence do occur with long-term use of opioids, many studies have shown that tolerance is limited in most patients with [Chronic pain]." Second, Actavis instructed its sales personnel that opioid "[d]oses are titrated to pain relief, and so no ceiling dose can be given as to the recommended maximal dose." Actavis failed to inform doctors, via its sales representatives, of the greater risks associated with opioids at high doses.

180.    The Kadian Learning System module dates from July 2010, but Actavis sales representatives were passing deceptive messages on to prescribers before that date. A July 2010 "Dear Doctor" letter issued by the FDA indicated that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]." Certain risks that the FDA noted were misrepresented include the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid agonists have the potential for being abused and are sought

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

by drug abusers and people with addiction disorders and are subject to criminal diversion." The FDA also took issue with an advertisement for misrepresenting Kadian's ability to help patients "live with less pain and get adequate rest with less medication," when the supporting study did not represent "substantial evidence or substantial clinical experience."

181.    Finally, the internal documents of another Defendant, Endo, indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines with doctors during detailing visits. These guidelines deceptively concluded that the risk of addiction is manageable for patients, regardless of past abuse histories, amongst other deceptive statements as described above.

182.    Rather than honestly disclose the risk of addiction, Defendants attempted to portray those who were concerned about addiction as callously denying treatment to suffering patients. To increase pressure on doctors to prescribe chronic opioid therapy, Defendants turned the tables: they suggested that doctors who *failed* to treat their patients' chronic pains with opioids were failing their patients and risking professional discipline, while doctors who prescribed long-term opioid therapy were following the compassionate (and professionally less risky) approach. Defendants claimed that "exaggerated" concerns about the risk of addiction resulted in patients' pain being under- treated while opioids were over-regulated and under-prescribed. The Treatment Options guide funded by Purdue and Cephalon claims that "[d]espite the great benefits of opioids, they are often underused." The APF publication funded by Purdue, *A Policymaker's Guide to Understanding Pain & Its Management*, laments that: "Unfortunately, too many Americans are not getting the pain care they need and deserve. Some common reasons for difficulty in obtaining adequate care include . . . misconceptions about opioid addiction."[31]

183.    *Let's Talk Pain*, sponsored by APF, AAPM and Janssen, likewise warns, "strict

---

[31] This claim also appeared in a 2009 publication by APF, *A Reporter's Guide*.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

regulatory control has made many physicians reluctant to prescribe opioids. The unfortunate casualty in all of this is the patient, who is often undertreated and forced to suffer in silence." The program goes on to say, "[b]ecause of the potential for abusive and/or addictive behavior, many health care professionals have been reluctant to prescribe opioids for their patients.... This prescribing environment is one of many barriers that may contribute to the undertreatment of pain, a serious problem in the United States."

b. *Defendants, Acting Individually and Collectively, Misrepresented That Opioids Improve Function.*

184.    Defendants produced, sponsored, or controlled materials with the expectation that, by instructing patients and prescribers that opioids would improve patient functioning and quality of life, patients would demand opioids and doctors would prescribe them. These claims also encouraged doctors to continue opioid therapy for patients in the belief that lack of improvement in quality of life could be alleviated by increasing doses or prescribing supplemental short-acting opioids to take on an as- needed basis for breakthrough pain.

185.    Although opioids may initially improve patients' function by providing pain relief in the short term, no controlled studies of the use of opioids beyond 12 weeks has ever shown that opioids improve patients' function in the long-term. On the contrary, research such as a 2008 study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[32] Despite this lack of evidence of improved function, and the existence of evidence to the contrary, Defendants consistently promoted opioids as capable of improving patients' function and quality of life without disclosing the lack of evidence for this claim.

---

[32] Jeffrey Dersh, et al., Prescription opioid dependence is associated with poorer outcomes in disabling spinal disorders, 33(20) Spine 2219-27 (Sept. 15,2008).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

186.    Claims that opioids improve patients' function are misleading because such claims have "not been demonstrated by substantial evidence or substantial clinical experience."[33]

187.    The Federation of State Medical Boards' Responsible Opioid Prescribing (2007), sponsored by drug companies including Cephalon, Endo and Purdue, deceptively taught that relief of pain in itself improved patients' function: "While significant pain worsens function, relieving pain should reverse that effect and improve function."

188.    Cephalon and Purdue sponsored the APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids, when used properly "give [pain patients] a quality of life we deserve." The Treatment Options guide notes that non-steroidal anti-inflammatory drugs (*e.g.,* Aspirin or Ibuprofen) have greater risks with prolonged duration of use, but there was no similar warning for opioids. The APF distributed 17,200 copies of this guide in one year alone, according to its 2007 annual report, and it is currently still available online.

189.    Through the APF, Endo sponsored a website, painknowledge.com, which claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life as well as "improved function" as benefits of opioid therapy.

190.    Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) in conjunction with the AAPM, ACPA and APF. This guide features a man playing golf on the cover and lists examples of expected functional

---

[33] Letter from Thomas W. Abrams, RPh., MBA, Dir., Div. of Marketing, Advertising and Communications to Brian A. Markison, Chairman, *King Pharmaceuticals*, Re: NDA 21-260 (March 24, 2008).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

improvement from opioids like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

191.   As set forth in the excerpt below, the guide states as a "fact" that "opioids may make it *easier* for people to live normally" (emphasis in the original). The myth/fact structure implies authoritative support for the claim that does not exist. The targeting of older adults also ignored heightened opioid risks in this population.



192.   Janssen sponsored a website, *Let's Talk Pain* in 2009, acting in conjunction with the APF, AAPM, and American Society for Pain Management Nursing whose participation in

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

*Let's Talk Pain* Janssen financed and orchestrated. This website featured a video interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative despite the lack of statistical support.

193.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* (2011), which inaccurately claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients," with the implication these studies presented claims of long-term improvement.

> Because of their long history of
> use, the clinical profile of opioids
> has been very well characterized.
> Multiple clinical studies have
> shown that long-acting opioids, in
> particular, are effective in
> improving:
>
> - Daily function
> - Psychological health
> - Overall health-related quality of
>   life for people with chronic
>   pain [12]

The sole reference for the functional improvement claim 1.) noted the absence of long-term studies and 2.) actually stated, "For functional outcomes, the other analgesics were significantly

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

more effective than were opioids."

194.    Purdue sponsored and Janssen provided grants to APP to distribute *Exit Wounds* to veterans, which taught that opioid medications "increase your level of functioning" (emphasis in the original).

c. *Defendants, Acting Individually and Collectively, Misrepresented that Addiction Risk can be Effectively Managed*

195.    Defendants each continue to maintain to this day that most patients can safely take opioids long-term for chronic pain relief without becoming addicted. Presumably to explain to doctors the high incidence of patient opioid addiction, Defendants have recently acknowledged that some patients could become addicted, but that doctors can effectively avoid or manage that risk by using screening tools or questionnaires. These tools, they claim, identify those with higher addiction risks (stemming from personal or family histories of substance abuse, mental illness, or abuse) and allow doctors to more closely monitor patients at greater risk of addiction.

196.    There are three fundamental flaws in Defendants' representations that doctors can consistently identify and manage the risk of addiction. First, there is no reliable scientific evidence that the addiction risk screening tools currently available are reliable, effective, capable of being applied correctly and consistently, or invulnerable to patient manipulation. Second, there is no reliable scientific evidence that high-risk or addicted patients identified through the screening tools can take opioids long-term without triggering or worsening addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients identified through such screening tools as "low risk" can take opioids long-term without significant danger of addiction.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

197.    Addiction is difficult to predict on a patient-by-patient basis, and there are no reliable, validated tools to do so. An Evidence Report by the Agency for Healthcare Research and Quality ("AHRQ"), which "systematically review[ed] the current evidence on long-term opioid therapy for chronic pain" identified "[n]o study" that had "evaluated the effectiveness of risk mitigation strategies, such as use of risk assessment instruments, opioid management plans, patient education, urine drug screening, prescription drug monitoring program data, monitoring instruments, more frequent monitoring intervals, pill counts, or abuse-deterrent formulations on outcomes related to overdose, addiction, abuse or misuse."[34] Furthermore, attempts to treat high-risk patients, like those who have a documented predisposition to substance abuse, by resorting to patient contracts, more frequent refills, or urine drug screening tests are not proven to work in the real world, even when the most well-intentioned doctors were misled to employ them.[35]

198.    Defendants' misrepresentations regarding the risk of addiction from chronic opioid therapy were particularly dangerous because they were aimed at general practitioners or family doctors (collectively "GPs"), who treat many chronic conditions but lack the time and expertise to closely manage patients on opioids by reviewing urine screens, counting pills, or conducting detailed interviews to identify other signs or risks of addiction. One study conducted by pharmacy benefits manager Express Scripts concluded, after analyzing 2011-2012 narcotic prescription data of the type regularly used by Defendants to market their drugs, that only 385 of the more than half million prescribers of opioids during that time period were identified as pain

---

[34] The Effectiveness and Risks of Long-term Opioid Treatment of Chronic Pain, Agency for Healthcare Res. & Quality (Sept. 19, 2014).

[35] M. Von Korff, et al., *Long-term opioid therapy reconsidered*, 15595, Annals Internal Med. 325 (Sept. 2011); L. Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part I – Evidence Assessment*, 15 Pain Physician S1 (2012).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

specialists.[36]

199.    In materials they produced, sponsored, or distributed, Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting on opioid therapy for chronic pain. Defendants' marketing scheme contemplated a "heads we win; tails we win" outcome: patients deemed low risk were to receive opioids on a long-term basis without enhanced monitoring, while patients deemed high risk were also to receive opioids on a long- term basis but with more frequent visits, tests and monitoring – with those added visits, tests, and monitoring to be paid for or reimbursed by payors, including Plaintiff. This, of course, led to a "heads you lose; tails you lose" outcome for patients – all of whom are subjected to an unacceptable risk of addition – and for payors, including Plaintiff.

200.    Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which falsely reassured patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed."

201.    Endo paid for a 2007 supplement available for continuing education credit in the Journal of Family Practice written by a doctor who became a member of Endo's speaker's bureau in 2010. This publication, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, (i) recommended screening patients using tools like (a) the *Opioid Risk Tool* created by Dr. Webster and linked to Janssen or (b) the *Screener and Opioid Assessment for Patients with Pain*, and (ii) taught that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

---

[36] Express Scripts Lab, A Nation in Pain: Focusing on U.S. Opioid Trends for Treatment of Short-Term and Longer-Term Pain (December 2014).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Purdue sponsored a 2011 webinar taught by Dr. Webster, entitled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This publication misleadingly taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths."

d. ***Defendants, Acting Individually and Collectively, Misled Physicians, Patients, and Payors Through the Use of the Term "Pseudoaddiction."***

202. Defendants instructed patients and prescribers that signs of addiction are actually the product of untreated pain, thereby causing doctors to prescribe ever more opioids despite signs that the patient was addicted. The word "pseudoaddiction" was concocted by Dr. J. David Haddox, who later went to work for Purdue, and was popularized in opioid therapy for chronic pain by Dr. Portenoy, who consulted for Defendants Cephalon, Endo, Janssen, and Purdue. Much of the same language appears in other Defendants' treatment of this issue, highlighting the contrast between "undertreated pain" and "true addiction" – as if patients could not experience both.

203. In the materials they produced, sponsored, or controlled, Defendants misrepresented that the concept of "pseudoaddiction" is substantiated by scientific evidence.

204. Cephalon and Purdue sponsored the Federation of State Medical Boards' Responsible Opioid Prescribing (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one   doctor to obtain opioids, and hoarding, which are in fact signs of genuine addiction, are all really signs of "pseudoaddiction."

205. Purdue did not mention that the author who concocted both the word and the phenomenon it purported to describe became a Purdue Vice President; nor did Purdue disclose

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

the lack of scientific evidence to support the existence of "pseudoaddiction."[37]

206.    Purdue posted an unbranded pamphlet entitled *Clinical Issues in Opioid Prescribing* on its unbranded website, PartnersAgainstPain.com, in 2005, and upon information and belief circulated this pamphlet after 2007. The pamphlet listed conduct including "illicit drug use and deception" that it claimed was not evidence of true addiction but rather was indicative of "pseudoaddiction" caused by untreated pain. It also stated, "Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when pain is untreated . . . . Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."

e. *Defendants, Acting Individually and Collectively, Claimed Withdrawal is Simply Managed.*

207.    In an effort to underplay the risk and impact of addiction, Defendants claimed that, while patients become physically "dependent" on opioids, physical dependence is not the same as addiction and can be addressed, if and when pain relief is no longer desired, by gradually tapering patients' dosage to avoid the adverse effects of withdrawal. Defendants failed to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids – an adverse effect that also makes it less likely that patients will be able to stop using drugs.

208.    In materials Defendants produced, sponsored, and/or controlled, Defendants made misrepresentations to persuade doctors and patients that withdrawal from their opioids was not a problem and they should not be hesitant about prescribing or using opioids. These claims were not supported by scientific evidence.

[37] J. David Haddox & David E. Weissman, *Opioid pseudoaddiction – an iatrogenic syndrome*, 36(3) Pain 363 (Mar. 1989).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

209. A CME sponsored by Endo entitled *Persistent Pain in the Older Adult*, taught that withdrawal symptoms can be avoided entirely by tapering a patient's opioid dose by 10% to 20% per day for ten days. This claim was misleading because withdrawal in a patient already physically dependent would take longer than ten days – when it is successful at all.[38]

210. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but the guide did not disclose the significant hardships that often accompany cessation of use.

### f. Defendants, Acting Individually and Collectively, Misrepresented that Increased Doses Pose no Significant Additional Risks.

211. Defendants claimed that patients and prescribers could increase doses of opioids indefinitely without added risk, even when pain was not decreasing or when doses had reached levels that were "frighteningly high," suggesting that patients would eventually reach a stable, effective dose. Each of Defendants' claims was deceptive in that it omitted warnings of increased adverse effects that occur at higher doses.

212. In materials Defendants produced, sponsored or controlled, Defendants instructed patients and prescribers that patients could remain on the same dose indefinitely, assuaging doctors' concerns about starting patients on opioids or increasing their doses during treatment, or about discontinuing their patients' treatment as doses escalated. These claims were not supported by scientific evidence.

213. Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid,

---

[38] See Jane Ballantyne, *New Addiction Criteria: Diagnostic Challenges Persist in Treating Pain with Opioids*, 21(5) Pain Clinical Updates (Dec. 2013).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

regardless of the dose currently prescribed. The guide taught that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose when the true figure was closer to 3,200 at the time.[39]

214.    Cephalon sponsored a CME written by KOL Dr.    Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC    from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating breakthrough pain because of dose limitations on the non-opioid component.

215.    Endo sponsored a website, *painknowledge.com*, through APF, which claimed in 2009 that opioids may be increased until "you are on the right dose of medication for your pain," at which point further dose increases would not be required.

216.    Endo distributed a patient education pamphlet edited by KOL Dr. Portenoy entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was published on Endo's website. In Q&A format, it asked, "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. ... You won't 'run out' of pain relief."

217.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dose escalations are "sometimes necessary," even indefinite ones, but did not disclose the risks from high-dose opioids. This publication is still available online.

---

[39] Robert E. Tarone, et al., Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies, 11 Am. J. of Therapeutics 17-25 (2004).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

218.    Purdue sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME was edited by KOL Dr. Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

g.  ***Defendants, Acting Individually and Collectively, Deceptively Omitted or Minimized the Adverse Effects of Opioids and Overstated the Risks of Alternative Forms of Pain Treatment.***

219.    In materials they produced, sponsored or controlled, Defendants omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would be more likely to choose opioids and would favor opioids over other therapies such as over-the-counter acetaminophen or over-the-counter or prescription NSAIDs. None of these claims was supported by scientific evidence.

220.    In addition to failing to disclose in promotional materials the risks of addiction, abuse, overdose, and respiratory depression, Defendants routinely ignored the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;"[40] hormonal dysfunction;[41] decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly;[42] neonatal abstinence syndrome (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or benzodiazepines, which are used to treat post-traumatic stress disorder and anxiety. Post-

---

[40] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA- 2012-P-0818 (Sept. 10, 2013).

[41] H.W. Daniell, Hypogonadism in men consuming sustained-action oral opioids, 3(5) J. Pain 377-84 (2001).

[42] Bernhard M. Kuschel, The risk of fall injury in relation to commonly prescribed medications among older people – a Swedish case-control study, Eur. J. Pub. H. (July 31, 2014).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

traumatic stress disorder and anxiety also often accompany chronic pain symptoms.[43]

221.    Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose when the figure is closer to 3,200.[44] *Treatment Options* also warned that risks of NSAIDS increase if "taken for more than a period of months," with no corresponding warning about opioids.

222.    Endo sponsored a website, painknowledge.com, through APF, which contained a flyer called "Pain: Opioid Therapy." This publication included a list of adverse effects that omitted significant adverse effects including hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death.

223.    Janssen and Purdue sponsored and Endo provided grants to APF to distribute *Exit Wounds* (2009), which omits warnings of the risk of potentially fatal interactions between opioids and certain anti-anxiety medicines called benzodiazepines, commonly prescribed to veterans with post-traumatic stress disorder.

224.    As a result of Defendants' campaign of deception, promoting opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID

---

[43] Karen H. Seal, Association of Mental Health Disorders with Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan, 307(9) J. Am. Med. Ass'n 940- 47 (2012).
[44] Robert E. Tarone, et al., Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies, 11 Am. J. of Therapeutics 17-25 (2004).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

prescribing.[45]

## G. DEFENDANTS' PROMOTION OF THEIR BRANDED DRUGS WAS ALSO DECEPTIVE

225.    While Defendants worked in concert to expand the market for opioids, they also worked to maximize their individual shares of that market. Each Defendant promoted opioids for chronic pain through sales representatives (which Defendants called "detailers" to deemphasize their primary sales role) and small group speaker programs to reach out to individual prescribers nationwide and in Lexington County. By establishing close relationships with doctors, Defendants were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

226.    Defendants developed sophisticated methods for selecting doctors for sales visits based on the doctors' prescribing habits. In accordance with common industry practice, Defendants purchase and closely analyze prescription sales data from IMS Health, a healthcare data collection, management and analytics corporation. This data allows them to track precisely the rates of initial and renewal prescribing by individual doctors, which allows them to target and tailor their appeals. Sales representatives visited hundreds of thousands of doctors and disseminated the misinformation and materials described above throughout the United States, including doctors in Lexington County.

---

[45] M. Daubresse, *et al.*, *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010,* 51(*10*) Med. Care, 870-878 (2013). For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady. *See also* J. Mafi, *et al.*, *Worsening Trends in the Management and Treatment of Back Pain*, 173(17) J. of the Am Med. Ass'n Internal Med. 1573, 1573 (2013).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

## H. DEFENDANTS KNEW THAT THEIR MARKETING OF CHRONIC OPIOID THERAPY WAS FALSE, UNFOUNDED, AND DANGEROUS AND WOULD HARM PLAINTIFF AND ITS RESIDENTS

227.    Defendants made, promoted, and profited from their misrepresentations – individually and collectively – knowing that their statements regarding the risks, benefits, and superiority of opioids for chronic pain were false and misleading. Cephalon and Purdue entered into settlements in the hundreds of millions of dollars to resolve criminal and federal charges involving nearly identical conduct. Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the significant adverse outcomes from opioids and that patients were suffering from addiction, overdoses, and death in alarming numbers.

228.    Defendants expected and intended that their misrepresentations would induce doctors to prescribe, patients to use, and payors to pay for their opioids for chronic pain.

229.    When they began their deceptive marketing practices, Defendants recklessly disregarded the harm that their practices were likely to cause. As their scheme was implemented, and as reasonably foreseeable harm began to occur, Defendants were well aware that it was occurring. Defendants closely monitored their own sales and the habits of prescribing doctors, which allowed them to see sales balloon – overall, in individual practices, and for specific indications. Their sales representatives, who visited doctors and attended CME programs, knew what types of doctors were receiving their messages and how they were responding. Moreover, Defendants had access to, and carefully monitored government and other data that tracked the explosive rise in opioid use, addiction, injury, and death.

230.    To provide a particularly egregious example, Insys engaged in an extended campaign of blatant fraud and deception to market its sublingual fentanyl medication Subsys for

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

chronic pain.

231.    Subsys is indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and are tolerant to opioid therapy for their underlying persistent cancer pain." The indication also specifies that "SUBSYS is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain." In addition, the indication provides that "[p]atients must remain on around-the-clock opioids when taking SUBSYS." Subsys is contraindicated for, among other ailments, the "[m]anagement of acute or postoperative pain including headache/migraine and dental pain." It is available in 100 mcg, 200 mcg, 400 mcg, 600 mcg and 800 mcg dosage strengths.

232.    Insys's revenue is derived almost entirely from Subsys.

233.    According to Dr. Andrew Kolodny, executive director of Physicians for Responsible Opioid Prescribing and chief medical officer of the Phoenix House Foundation, fentanyl products are "'the most potent and dangerous opioids on the market.'"

234.    The dangers associated with Subsys are reflected by its extremely limited and specific indication, as it is approved solely for breakthrough pain ("BTP") in cancer patients already receiving opioids for persistent cancer-related pain.

235.    Despite Subsys's limited indication and the potent danger associated with fentanyl, Insys falsely and misleadingly marketed Subsys to doctors as an effective treatment for back pain, neck pain and other off-label pain conditions.

I. **DEFENDANTS FRAUDULENTY CONCEALED THEIR MISREPRESENTATIONS**

236.    Defendants took steps to avoid detection of, and to fraudulently conceal, their deceptive marketing and conspiratorial behavior.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

237.    Defendants disguised their own roles in the deceptive marketing by funding and working through Front Groups purporting to be patient advocacy and professional organizations and through paid KOLs. Defendants purposefully hid behind the assumed credibility of the front organizations and KOLs and relied on them to vouch for the accuracy and integrity of Defendants' false and misleading statements about opioid use for chronic pain. While Defendants were listed as sponsors of many of the publications described in this Complaint, they never disclosed their role in shaping, editing, and approving their content. Defendants exerted their considerable influence on these purportedly "educational" or "scientific" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not public.

238.    In addition to hiding their own role in generating the deceptive content, Defendants manipulated their promotional materials and the scientific literature to make it appear these items were accurate, truthful, and supported by substantial scientific evidence. Defendants distorted the meaning or import of materials they cited and offered them as evidence for propositions the materials did no support. The true lack of support for Defendants' deceptive messages was not apparent to the medical professionals who relied upon them in making treatment decisions. The false and misleading nature of Defendants' marketing was not known to, nor could it reasonably have been discovered by, Plaintiff or its residents.

239.    Defendants also concealed their participation by extensively using the public relations companies they hired to work with Front Groups to produce and disseminate deceptive materials.

240.    Defendants concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the existence of claims that Plaintiff now asserts.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Plaintiff did not discover the existence and scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence. Through the public statements, marketing, and advertising, Defendants' deceptions deprived Plaintiff of actual or implied knowledge of facts sufficient to put them on notice of potential claims.

## J. DISTRIBUTOR DEFENDANTS INTENTIONALLY FAILED TO TAKE ANY ACTION TO STOP THE MISUSE OF OPIOIDS, IN VIOLATION OF STATE LAWS AND REGULATIONS

241.    The Distributor Defendants purchased opioids from manufacturers, such as the named Manufacturer Defendants herein, and sold them to pharmacies throughout Lexington County.

242.    The Distributor Defendants played an integral role in the chain of opioids being distributed throughout Lexington County.

243.    The South Carolina Poisons, Drugs, and other Controlled Dangerous Substances Act, S.C.. Code Ann., § 44-53-10, incorporates 21 CFR § 1301.74(b) at S.C. Code Ann., § 44-53-340.

244.    Federal regulations, incorporated as stated above, similarly impose a nondelegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

245.    "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern. See 21 CFR 1301.74(b). These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether an order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

246.    In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

247.    These prescription drugs are regulated for the purpose of providing a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

248.    Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.

249.    As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

purposes. This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."

250.    The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.

251.    The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."97 The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes." The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."

252.    The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[46] This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[47] The letter further explains:

> The regulation also requires that the registrant inform the local
> DEA Division Office of suspicious orders when discovered by the
> registrant. Filing a monthly report of completed transactions (e.g.,
> "excessive purchase report" or "high unity purchases") does not
> meet the regulatory requirement to report suspicious orders.
> Registrants are reminded that their responsibility does not end

---

[46] See Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin.,
U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185- RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.
[47] *Id.*

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

> Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.[48]

> Finally, the DEA letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[49]

253.    The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."[50]

254.    The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." The guidelines set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of

---

[48] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), *Supra.*

[49] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), *Supra.*

[50] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *2 [hereinafter Brief of HDMA].

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[51]

255.    Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in Plaintiff's Community and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to Plaintiff's Community.

256.    Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system collapses.[52]

257.    The sheer volume of prescription opioids distributed to pharmacies in the Plaintiff's Community, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Plaintiff's community, is excessive for the medical need of the community and facially suspicious, some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[53]

258.    Additionally, the Distributor Defendant's grossly negligent distribution to pharmacies outside the state also caused an influx of illicit diversion of opioids within Lexington County.

259.    The Distributor Defendants failed to report "suspicious orders" originating from

---

[51] Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

[52] *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-2.

[53] *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316, 62,322 (2012)).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Plaintiff's Community, or which the Distributor Defendants knew were likely to be diverted to Plaintiff's Community, to the federal and state authorities, including the DEA and/or the state Board of Pharmacy.

260.    The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Plaintiff's Community, and/or in areas from which the Distributor Defendants could foreseeably anticipate that opioids were likely to be diverted to Plaintiff's Community.

261.    The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Plaintiff's Community, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff's Community.

262.    The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

263.    The Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the South Carolina Department of Health of suspicious orders when discovered, in violation of their duties under federal and state law.

264.    The Distributor Defendants failed to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[54]

265.    The federal and state laws at issue here are public safety laws.

266.    The unlawful conduct by the Distributor Defendants is purposeful and intentional.

---

[54] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

267.    The Distributor Defendants refuse to abide by the duties imposed by federal and state law which are required to legally acquire and maintain a license to distribute prescription opiates.

268.    The Distributor Defendants acted with actual malice in breaching their duties, *i.e.*, they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

269.    The Distributor Defendants' repeated shipments of suspicious orders, over an extended period, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

270.    The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under state and federal law and have wrongfully and repeatedly disavowed those duties to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

271.    Wholesale Distributor McKesson was recently forced to specifically admit to breach of its duties to monitor, report, and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[55]

---

[55] Department of Justice, Administrative Memorandum of Agreement, January 17, 2017, https://www.justice.gov/opa/press-release/file/928476/download, (accessed June 15, 2018).

272. Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."[56] McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 *et seq.*, at the McKesson Distribution Centers" including the McKesson Distribution Centers located in 12 different locations, any of which could have foreseeably caused the diversion of opioids into Lexington County.[57] Due to these violations, McKesson agreed that its authority to distribute controlled substances from these 12 facilities would be partially suspended.[58]

273. As punishment for its wrongdoing, McKesson agreed to pay a $150 million fine and suspend the sale of controlled substances from distribution centers in several states.[59]

274. The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of controlled substances to the DEA.[60] In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA," but had failed in its

---

[56] Department of Justice, *Administrative Memorandum of Agreement* at 4, *Supra*.
[57] *Id.*
[58] *Id.* at 6.
[59] *Id.* at 8.
[60] *Id.* at 4.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

obligations.[61] The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations."[62]

275.    Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

276.    Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[63] The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[64]

277.    Defendant Rite Aid had a duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Lexington County, South Carolina. In January 2009, Rite Aid agreed that it failed to comply by these requirements after a pattern of failing to meet its duty was discovered by the Department of Justice.126 Rite Aid ultimately agreed to pay $5 million for breaching its duty to report any "suspicious orders" of prescription

---

[61] *Id.*

[62] *Id.*

[63] U.S. Dep't of Justice, Evaluation and Inspections Div., Office of the Inspector Gen., *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf, (accessed June 15, 2018).

[64] *Id.*

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

opiates. to the DEA and/or the South Carolina Board of Pharmacy between 2006 to the present. Rite Aid similarly breached its duty by failing to report any suspicious orders of prescription opiates originating in Lexington County and South Carolina between 2006 to the present. Rite Aid's failure contributed to the excessive non-medical opioid prescriptions filled in Lexington County from 2006 until present. Rite Aid, operating within South Carolina and Lexington County, must have neglected its duties, given that retail opioid prescriptions dispensed were 107.4 per 100 persons in Lexington County in 2016. Additionally, the allegations below detailing the exploits of the South Carolina Physician Defendants show instances of suspicious orders that should have been detected and reported by distributors like Rite Aid. Suspicious orders continue currently and are made by the Physician Defendants as detailed below, and have been left unreported by Rite Aid. Rite Aid's failures are a direct and proximate cause of the diversion of prescription opiates for nonmedical purposes in Lexington County and across South Carolina, causing opioid abuse, addiction and deaths in Lexington County and across the state.

278.    Defendant CVS has paid over $40 million in fines as the result of opioid prescription investigations by the DEA and the United States Department of Justice. Yet CVS continues to dispense opioids in quantities significantly higher than medically necessary to residents of Lexington County. In February 2016, CVS paid $8 million to settle allegations made by the DEA and the Department of Justice that its stores and pharmacists had been violating their duties under the Controlled Substances Act, by filling prescriptions with no legitimate medical purpose. CVS has settled similar cases with Florida, Oklahoma, Massachusetts, New Hampshire, and Rhode Island, for filling forged prescriptions for addictive painkillers and filling prescriptions with no legitimate medical purpose.

279.    Operating within South Carolina and Lexington County, the Distributor

Defendants must have neglected their duties given that the prescribing rate for Lexington County in 2016 was 91.8; meaning the number of retail opioid prescriptions dispensed per 100 persons was 91.8 in Lexington County in 2016. The opioid prescribing rate in 2016 for the entire State of South Carolina was 89.4 prescriptions per 100 persons.

280.    In addition to the deaths caused by these drugs, there are other human costs. Statewide, South Carolina EMS personnel administered Narcan approximately 6,400 times in 2016 and 4,600 times in 2015. In Lexington County, first responders administered Narcan 123 times in 2014, 167 times in 2015, and 253 times in 2016. This represents a 51.50% increase in Narcan administration from 2015 to 2016, and puts Lexington at the top of the list for Narcan administration.

281.    The Distributor Defendants failed to detect and report actions by the Physician Defendants, and others similarly situated, which caused the opioid epidemic plaguing Lexington County. As noted previously, the data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database.

282.    Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

violations of law before a suspension order can be issued.[65]

283.    In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

284.    For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[66] Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results in favor of profits.

285.    Similarly, Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is

---

[65] Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.61697ec67e05; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html?utm_term=.014176059151; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, http://www.100daysinappalachia.com/2017/02/22/dea-agent-no-leadership-west-virginia-amid-flood-pain-pills/, Charleston Gazette-Mail, Feb. 18, 2017, (all accessed June 15, 2018).
[66] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10c79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.6d9936e87c93, (accessed June 15, 2018).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

"deeply passionate about curbing the opioid epidemic in our country."[67] Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

286.    By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. The Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

287.    Meanwhile, the opioid epidemic rages unabated in the Nation, the State, and in Lexington County.

288.    Between the years in question, including 2007 through 2017, the Distributor Defendants have shipped millions of doses of highly addictive controlled opioid pain killers into Lexington County and elsewhere, causing diversion of opioid pain killers within Lexington County.

289.    Many of these orders should have been stopped, or at the very least, investigated as potential suspicious orders.

290.    The sheer volume of the increase in opioid pain medications, including OxyCodone, being distributed to retailers, should have put the Distributor Defendants on notice to investigate and report such orders.

291.    The Distributor Defendants delivered an excessive and unreasonable amount of opioid pain medications to retailers in Lexington County and elsewhere.

---

[67] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html?utm_term=.0b845f727e2c, (accessed June 15, 2018).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

292.    Upon information and belief, the Distributor Defendants did not refuse to ship or supply any opioid medications to any pharmacy in Lexington County from 2007 to the present.

293.    The Defendant Distributors knew or should have known that they were distributing levels of opioid medications that far exceeded the legitimate needs of Lexington County.

294.    The Defendant Distributors also paid their sales force bonuses and commissions on the sale of most or all of the highly addictive opioid pain medications within Lexington County.

295.    The Distributor Defendants made substantial profits from the opioids sold in Lexington County and elsewhere.

296.    By the actions and inactions described above, the Distributor Defendants showed a reckless disregard for the safety of the residents of Lexington County.

297.    By the actions and inactions described above, the Distributor Defendants caused great harm to the Lexington County.

298.    The Distributor Defendants have abandoned their duties imposed under federal and state law; taken advantage of a lack of DEA law enforcement; and abused the privilege of distributing controlled substances in the State and Plaintiff's Community.

## K. VARIOUS DOCTORS, INCLUDING THE PHYSICIAN DEFENDANTS RECKLESSLY CAUSED THE DIVERSION OF PRESCRIPTION OPIOIDS THROUGHOUT SOUTH CAROLINA AND LEXINGTON COUNTY

299.    Importantly, the Manufacturer and Distributor Defendants' negligent, deceptive, reckless, and/or willful and wanton actions, as described in detail throughout this complaint, caused and created the market for the illegal diversion of opioids for nonmedical purposes by the various Physician Defendants.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

300.    Dr. Roger Hershline[68] operated an office in Hilton Head, South Carolina that functioned as a "Pill Mill" by vastly overprescribing opioid medications without a legitimate medical purpose.

301.    Dr. Hershline wrote thousands of opioid prescriptions without the appropriate physical examination or medical need to profit from this activity, causing diversion of opioid medications throughout South Carolina and Lexington County.

302.    Dr. D. Vincent Rhodes also participated in a prescription drug ring, prescribing prescription opioids without the appropriate physical examination or medical need to profit from this activity, causing diversion of over ten thousand opioid medications across South Carolina and within Lexington County. [69]

303.    Subsequent to Dr. Rhodes' and Dr. Hershline's actions, other health care providers in Lexington County wrote thousands of opioid prescriptions without the appropriate physical examination or medical need to profit from this activity, causing diversion of opioid medications throughout South Carolina and Lexington County.

304.    Upon information and belief, set out in part below, John Doe 1 and John Doe 2 conspired with others to distribute and dispense opioids not for a medical purpose, receiving a financial benefit from their actions.

305.    Upon information and belief, repeatedly, over the course of years, John Doe 1 and John Doe 2 participated in the illegal diversion of opioids.

306.    Upon information and belief, Clinic 1 and Clinic 2 failed to implement reasonable protocols and procedures to prevent the recklessness and fraud that causes opioids to enter the

---

[68]    Davis, Kelly, *Doctor sentenced to 41 months in prison*, http://www.thestate.com/news/local/crime/article14379230.html (accessed June 15, 2018).

[69]    Moody, Erin, *Beaufort doctor sentenced to 1 year for role in cocaine, prescription drug ring*, http://www.islandpacket.com/news/local/community/beaufort-news/article33613854.html (accessed June 15, 2018).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

black market in Lexington County and South Carolina.

307.    Upon information and belief, Clinic 1 and Clinic 2 owed a duty to the Plaintiff and the Public to exercise nonmedical, administrative, ministerial and routine protocols to keep appropriate records and knowingly dispensed suboxone for nonmedical purposes, in violation of S.C. Code Ann. §§ 44-53-360(h); 44-53-340; and 44-53-390(a)(4).

308.    Defendant Thiyagarajah, acting in concert with Pain and Spine Consultants, PA, prescribed Subsys and other opioids off-label within multiple Upstate counties, for nonmedical purposes not indicated by the FDA. These Defendants deliberately addicted patients, trapping them in a vicious cycle and ruining their lives, for the sake of profits while receiving kick-backs and expensive travel from Insys. They operated as de facto drug dealers in white coats, greatly contributing to the diversion of opioids and wave of addiction across South Carolina.

309.    Defendants Thiyagarajah and Pain and Spine Consultants, PA knew that Subsys was solely approved by the FDA for use in cancer patients, already on opioids, experiencing BTP at the end of their life. Despite this knowledge, these Defendants knowingly and recklessly deceived chronic pain patients into believing Subsys was safe for long term use. As an example, on South Carolina woman reports that she was convinced by these Defendants to take Subsys for chronic abdominal pain from Crohn's disease. She received the drug for years and experienced blackouts, uncontrolled diarrhea, and vomiting. Defendants Thiyagarajah and Pain and Spine Consultants, PA consistently reassured her that it was not the Subsys causing these problems. The South Carolina woman became addicted and, she states, these Defendants ruined her life. At one point, she asked Defendant Thiyagarajah to take her off Subsys, but he angrily insisted that it was Subsys or nothing.139 Defendants Thiyagarajah and Pain and Spine Consultants, PA knew that if they stopped prescribing Subsys to this South Carolina woman and others, they would stop

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

receiving the lavish kickbacks and trips from Insys.

310.    Defendants Thiyagarajah and Pain and Spine Consultants, PA received 50 times more payments from Insys than other similarly situated peers for speaking, training, education, and consulting on behalf of Insys.

311.    Defendants Thiyagarajah and Pain and Spine Consultants, PA issued opioid prescriptions for nonmedical purposes in addition to Subsys, issuing nearly double the amount of opioid prescriptions per patient than other similarly situated physicians. At one point in 2015, a Drug Enforcement Agency investigation concluded that these defendants were prescribing buprenorphine for nonmedical purposes as well, in violation of state and federal laws. Defendants Thiyagarajah and Pain and Spine Consultants, PA have victimized as many as 12,000 people from across South Carolina.

312.    The actions of Defendants Thiyagarajah and Pain and Spine Consultants, PA greatly contributed to the diversion of opioids and the wave of addiction across South Carolina and within Spartanburg County.

313.    Defendants Thiyagarajah and Pain and Spine Consultants, PA failed to exercise the nonmedical, administrative, ministerial and routine duty owed to the Plaintiff and the Public of preventing the diversion of opioids into the black market as he wrote prescriptions for nonmedical purposes outside of a bona fide practitioner-patient relationship, in violation of S.C. Code Ann. §§ 44-53-360(c) and 44-53-360(h), and failed to conform with the record-keeping requirements of S.C. Code Ann. §§ 44-53-340 and 44-53-390(a)(4).

314.    Defendants Thiyagarajah and Pain and Spine Consultants, PA failed to exercise the nonmedical, administrative, ministerial and routine duty of determining whether patients obtained opioids from other physicians in violation of S.C. Code Ann. § 44-53-1645.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

315.    Upon information and belief, the Physician Defendants all financially benefited and continue to derive financial benefit from the acts described herein.

316.    Dr. Hershline, Dr. D. Vincent Rhodes, and the Physician Defendant's practices resulted in the additional cost for (among other things) substance abuse treatment, toxicology assessment, emergency hospitalization care, lost tax revenue, economic loss, and foster care to Lexington County and other South Carolina Counties, costs which continue to be incurred to date.

L.  **DESPITE KNOWING THE EXCESSIVE RISK OF ADDICTION, MISUSE, AND ABUSE TO THE COUNTY AND SOUTH CAROLINA THE SALES REPRESENTATIVE DEFENDANTs MISREPRESENTED THE SAFETY OF OPIOIDS FOR TREATING CHRONIC PAIN TO PHYSICIANS**

317.    At all relevant times, Defendant Sullivan was a Purdue sales detail person and/or district manager in South Carolina and was responsible for the promotion, advertisement, sale, marketing, and/or distribution of OxyContin in South Carolina, including to those who prescribed and/or consumed the drug in the County and across the state.

318.    From 2009 until the present, Defendant Sullivan directed, ratified, trained, supervised, and managed all Purdue sales personnel within the state of South Carolina and including Lexington County to utilize all of the deceptive sales tactics and marketing materials developed by Purdue and described in detail throughout this complaint.

319.    From 2015 until the present, Defendant Waldrop was a Purdue sales detail person and/or territory business manager in Lexington County, South Carolina, and surrounding areas, and was responsible for the promotion, advertisement, sale, marketing, and/or distribution of OxyContin in Lexington County, South Carolina, and surrounding areas, including to those who prescribed and/or consumed the drug in the County and across the state.

320.    The Sales Representative Defendants, including Defendant Sullivan and

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Defendant Waldrop, owed a duty of care to Plaintiff in the marketing, advertising, sale, and promotion of Purdue's highly dangerous, addictive and abuse prone OxyContin.

321.    The Sales Representative Defendants owed Plaintiff a duty to use reasonable care because, inter alia, it was foreseeable, and in fact known to the Sales Representative Defendants that their conduct would result in injuries and damages to and within the County.

322.    The Sales Representative Defendants were aware that OxyContin posed an excessive risk of harm to South Carolina and Lexington County, including its risks relating to addiction, abuse, and diversion, all of which were occurring and ongoing in the County and across the state.

323.    The Sales Representative Defendants had actual knowledge that the safety, efficacy, addictiveness, abuse and diversion potential of OxyContin was negligently and recklessly marketed, advertised, promoted, and sold.

324.    The Sales Representative Defendants knew that OxyContin was highly susceptible to addiction, misuse, abuse and/or diversion and the risk for each of these factors bore a direct relationship to the amount and volume of opioids being prescribed within South Carolina and Lexington County, and in fact that Oxycontin was being misused, abused and diverted across the country, including within Lexington County and across South Carolina.

325.    The Sales Representative Defendants knew or should have known that OxyContin was unreasonably dangerous and highly addictive and highly susceptible to abuse and diversion, yet knowingly and negligently provided false and/or misleading information to prescribers within South Carolina, including Lexington County and South Carolina, concerning the risk of addiction, abuse and diversion of OxyContin and of its relative safety.

326.    The Sales Representative Defendants also represented to prescribers throughout

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

South Carolina and Lexington County that OxyContin was safe for use in chronic pain patients.

327.    Upon information and belief, the Sales Representative Defendants purposefully or negligently caused the flooding of communities across South Carolina, including Lexington County, with highly dangerous and addictive opioids knowing that these drugs were being misused, abused and diverted.

328.    Despite the knowledge about the dangers of opioids, and in direct disregard for the known and foreseeable harms to Plaintiffs, the Purdue Sales Representative Defendants negligently and recklessly breached their duty to Plaintiffs by, but not limited to:

      i.   Negligently and recklessly marketing, advertising, and promoting OxyContin in Lexington County and surrounding areas;

      ii.   Misrepresenting and misstating the addiction, abuse and/or diversion potential of OxyContin;

      iii.   Overstating the benefits of chronic OxyContin therapy, promising improvement in patients' function and quality of life, and failing to disclose the lack of evidence supporting long-term use;

      iv.   Downplaying and/or obscuring OxyContin's serious risks and adverse outcomes, including the risk of addiction, abuse, diversion, overdose, and death;

      v.   Overstating OxyContin's superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives;

      vi.   Mischaracterizing the difficulty of withdrawal from OxyContin and the prevalence of withdrawal symptoms;

      vii.   Marketing OxyContin for indications and benefits that were not supported by substantial evidence; and,

      viii.  Misrepresenting to health care providers that it was more difficult to extract the oxycodone from an OxyContin tablet for the purpose of misuse or abuse.

329.    At all times material herein, the Sales Representative Defendants willingly and knowingly participated in Defendant Purdue's deceptive and misleading marketing scheme, were

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

aware of its existence, and did nothing about it. The Purdue Sales Representative Defendants promoted, perpetuated, and furthered Purdue's deceptive and misleading marketing campaign by knowingly falsely promoting and marketing OxyContin as less addictive and less subject to abuse and diversion than other opioids.

330.    The Purdue Sales Representative Defendants had a financial incentive to knowingly provide false information to prescribers within South Carolina and Lexington County and their pay and continued employment depended on the volume of sales and prescriptions written within their District and surrounding areas. Upon information and belief, the Sales Representative Defendants received extremely lucrative bonuses, trips, and other items of value as a result of their success in pushing OxyContin into the communities of South Carolina.

331.    Defendant Sullivan further trained her sales representatives to employ various tactics to evade physicians' questions regarding OxyContin's addictiveness and likelihood of addiction, misuse, abuse, and/or diversion and to misrepresent and conceal facts relating to OxyContin safety. By way of example, and not limitation, Defendant Sullivan trained her sales representatives to be "Audible Ready" when questioned about opioid street-abuse and to misrepresent OxyContin's addictiveness and likelihood of abuse, diversion, and misuse.

332.    Upon information and belief, after receiving reports from prescribers and medical professionals that OxyContin was being abused and diverted in and around Lexington County, Defendant Sullivan instructed her sales team to ride out the controversy, ignore abuse reports, and "sell through it."

333.    At all times material herein, prescribers and consumers within South Carolina and in Lexington County relied upon the representations made by both Defendant Sullivan and Defendant Waldrop, the Purdue Sales Representative Defendants, and their sales team and their

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

reliance was justified.

334. As stated herein, Defendant Sullivan's and the other Purdue Sales Representative Defendants' breach of duty bears a causal connection with and/or proximately resulted in the harm and damages to the Plaintiff.

335. As a direct and proximate result of the Purdue Sales Representative Defendants' actions, as set forth herein, Plaintiffs have suffered and continue to suffer injury and damages, including but not Limited to, incurring excessive costs related to diagnosis, treatment, and cure of abuse and/or. addiction or risk of addiction to opioids; bearing the massive costs of these illnesses and conditions by having to provide necessary resources for treatment facilities, and law enforcement associated with opioid addiction, abuse and diversion; and property damage.

336. In summary, while the manufacturers are the source of the drugs, wholesale distributors provide them to pharmacies, including large chain pharmacies, community pharmacies, hospitals and other medical facilities which are the links to the consumer, the patient, who obtains a prescription order from a licensed prescriber. The delivery of prescription drugs takes place within a complex system that controls the price and flow of drugs in America. All of the Defendants are involved in the supply chain that delivers prescription drugs, including opioids, to patients. For example, as outlines in a recent article discussing the opioid epidemic, "[f]rom 1996 to 2002, Purdue pursued nearly every avenue in the drug supply and prescription sales chain . . . ."[70]

337. The claims against these Defendants have a logical relationship to one another and arise from the same or substantially related series of transactions and occurrences. All of these Defendants are integral players in the prescription drug supply chain that provides opioids

---

[70] Fred Schulte, *How America Got Hooked On A Deadly Drug: An inside look at how Purdue Pharma pushed OxyContin despite risks of addiction and fatalities.*, Kaiser Health News, June 13, 2018, https://khn.org/news/how-america-got-hooked-on-a-deadly-drug/ (accessed June 15, 2018).

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

and other prescription drugs to people in Lexington County, South Carolina.

## FIRST CAUSE OF ACTION
## SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT – DECEPTIVE AND UNFAIR ACTS AND PRACTICES
## (ALL DEFENDANTS)

338.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

339.    At all times relevant to this Complaint, Defendants were engaged in the trade or commerce of manufacturing, marketing, selling, and/or distributing prescription opioid pain medications. For 20 years, Defendants have been the leading force in the prescription opioid market, both nationwide and in South Carolina.

340.    By engaging in the acts and practices alleged herein, Defendants made or caused to be made to South Carolina consumers, directly or indirectly, explicitly or by implication, misrepresentations that, reasonably interpreted, are material, false, and likely to mislead.

341.    Defendants violated the South Carolina Unfair Trade Practices Act, S.C. Code Ann., §§ 39-5-10, *et seq.* ("SCUTPA"), because they engaged in deceptive acts or practices in the conduct of business, trade or commerce within South Carolina and Lexington County, including:

- The Manufacturer Defendants' and Sales Representative Defendants' marketing of opioid drugs as safe and effective for the long-term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- The Manufacturer Defendants' and Sales Representative Defendants' creating, sponsoring, and/or assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- The Manufacturer Defendants' and Sales Representative Defendants' disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseud- addiction through Defendants' own unbranded

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

publications and on internet sites Defendants operated that were marketed to and accessible by consumers;

- The Manufacturer Defendants' and Sales Representative Defendants' distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;

- The Manufacturer Defendants' and Sales Representative Defendants' sponsoring, directly distributing, and/or assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

- The Manufacturer Defendants' providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of South Carolina and Federal law;

- The Manufacturer Defendants' and Sales Representative Defendants' endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' developing and/or disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- The Manufacturer Defendants' and Sales Representative Defendants' assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' creating, endorsing, and/or supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- The Manufacturer Defendants' and Sales Representative Defendants' exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

- The Manufacturer Defendants' and Sales Representative

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Defendants' making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

- The Distributor Defendants' holding themselves out as law-abiding distributors but instead withholding from law enforcement the names of prescribers they knew to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating South Carolina and Federal law by not reporting these doctors instead; and,
- The Physician Defendants' falsely representing to patients and the public that they lawfully prescribed opioids for medical treatment when their practice of prescribing was for nonmedical purposes, violated laws, and done for the sole purpose of making profit.

342. Defendants knew at the time that they made their misrepresentations and omissions that 1) they were false and 2) had the tendency to influence the consumer choices of Plaintiff and its residents.

343. Defendants designed their misrepresentations and omissions for the purpose of influencing Plaintiff and its residents into relying upon them.

344. Defendants' acts and practices as alleged in this Complaint had a capacity or tendency to deceive. When considered from the perspective of a reasonable consumer, these acts or practices were likely to mislead South Carolina consumers in Lexington County.

345. The Manufacturer Defendants' and Sales Representative Defendants' consistent, repeated, deceptive representations that their opioids had properties unsupported by medical literature did in fact deceive Plaintiff and its residents, causing them to both prescribe and consume opioids for the treatment of chronic pain conditions and suffer from addiction when they otherwise would not.

346. The Distributor and Physician Defendants' consistent, repeated, deceptive

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

representations that they kept records as required by law and were prescribing opioids for legitimate medical purposes did in fact deceive Plaintiff and its residents, resulting in widespread addiction that otherwise would not have occurred.

347.    Given the incredible resources the Manufacturer Defendants and Sales Representative Defendants put into crafting their misrepresentations to pervade nearly every source of trusted medical information, Plaintiff and its residents reasonably relied upon Defendants' misrepresentations and omissions, as stated above.

348.    Given the infinitely better-resourced and highly sophisticated nature of the Distributor Defendants' practices, and their intimate knowledge of state and federal legal requirements, Plaintiff and its residents reasonably relied on the Distributor Defendants to uphold its legal requirements and not commit intentional, material omissions to law enforcement for the sake of its own profits.

349.    Given the efforts taken by the Physician Defendants to obtain a medical license, operate a business, and present the outward appearance of legitimate medical practitioners, Plaintiff and its residents reasonably relied on the Physician Defendants representations that they were providing medical treatment and not engaging in unlawful, nonmedical dissemination of opioids to addicts for the sole purpose of profit.

350.    Plaintiff and its residents have been injured by reason of Defendants' violations of SCUTPA. Plaintiff's injuries were directly caused by Defendants' deceptive behavior, resulting in increased expenditures on public healthcare services, law enforcement, the justice system, child and family services as well as lost productivity and lost tax revenue. The health and wellbeing of the citizens of Lexington County, including those who have abused or will abuse prescription opioids, or were led to their addiction by the acts of Defendants, is a matter of vital

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

and legitimate concern to Plaintiff and its citizens.

351.    Defendants' conduct was willful or knowing under S.C. Code § 39-5-140.

352.    Defendants' acts or practices alleged herein constitute unfair or deceptive acts or practices in violation of SCUTPA and have proximately caused and continue to cause an ascertainable loss of money and property to Plaintiff.

353.    Every deceptive, unfair, and/or misrepresentative act by Defendants constitutes a separate and distinct violation of S.C. Code § 39-5-20, capable of repetition and affecting and impacting the public's interest. Defendants' acts in violation of SCUTPA are patently offensive to public policy, unethical, immoral, and oppressive.

354.    Plaintiff is informed and believes that it is entitled to actual damages in an amount to be determined by the jury, and that Plaintiff is entitled to an award of treble damages munder SCUTPA and an award of reasonable attorney's fees.

### SECOND CAUSE OF ACTION
### FRAUD
### (AGAINST ALL DEFENDANTS)

355.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

356.    Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail above, including:

- The Manufacturer Defendants' and Sales Representative Defendants' marketing of opioid drugs as safe and effective for the long-term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- The Manufacturer Defendants' and Sales Representative

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Defendants' creating, sponsoring, and/or assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;

- The Manufacturer Defendants' and Sales Representative Defendants' disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudo-addiction through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;

- The Manufacturer Defendants' and Sales Representative Defendants' distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;

- The Manufacturer Defendants' and Sales Representative Defendants' sponsoring, directly distributing, and/or assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

- The Manufacturer Defendants' providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of South Carolina and Federal law;

- The Manufacturer Defendants' and Sales Representative Defendants' endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' developing and/or disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- The Manufacturer Defendants' and Sales Representative Defendants' assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' creating, endorsing, and/or supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain,

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- The Manufacturer Defendants' and Sales Representative Defendants' exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;
- The Manufacturer Defendants' and Sales Representative Defendants' making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;
- The Distributor Defendants' holding themselves out as law-abiding distributors but instead withholding from law enforcement the names of prescribers they knew to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating South Carolina and Federal law by not reporting these doctors instead; and,
- The Physician Defendants' falsely representing to patients and the public that they lawfully prescribed opioids for medical treatment when their practice of prescribing was for nonmedical purposes, violated laws, and done for the sole purpose of making profit.

357.    Defendants knew at the time that they made their misrepresentations and omissions that they were false.

358.    Defendants intended that Plaintiff and its residents would rely on their misrepresentations and omissions.

359.    Given the incredible resources Defendants put into crafting their misrepresentations to pervade nearly every source of trusted medical information, Plaintiff and its residents reasonably relied upon Defendants' misrepresentations and omissions, as stated above.

360.    Given the infinitely better-resourced and highly sophisticated nature of the Distributor Defendants' practices, and their intimate knowledge of state and federal legal requirements, Plaintiff and its residents reasonably relied on the Distributor Defendants to

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

uphold its legal requirements and not commit intentional, material omissions to law enforcement for the sake of its own profits.

361.    By reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiff and its residents suffered actual pecuniary damage directly caused by Defendants' deceptive behavior resulting in increased expenditures on public healthcare services, law enforcement, the justice system, child and family services as well as lost productivity and lost tax revenue.

362.    Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

363.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

364.    The doctrine of unjust enrichment is meant to prevent the wrongful retention of a benefit in violation of good conscience and fundamental principles of justice and equity, or to prevent a double recovery. Unjust enrichment permits recovery of that amount the defendant has been unjustly enriched at the expense of the Plaintiff.

365.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint above, Defendants have profited and benefited from opioid purchases made by Plaintiff and its residents.

366.    In exchange for the opioid purchases, and at the time Plaintiff and its residents made these payments, Plaintiff and its residents expected that Defendants had provided all of the necessary and accurate information regarding those risks and had not misrepresented any

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

material facts regarding those risks.

367.    Defendants wrongdoing directly caused Plaintiff to suffer increased expenditures on public healthcare services, law enforcement, the justice system, child and family services as well as lost productivity and lost tax revenue, without receiving any of the purported benefits deceptively promoted by Defendants.

368.    Defendants acts and practices alleged herein were motivated by a desire to retain and increase market share and profits, and were undertaken in bad faith.

369.    Lexington County has suffered injuries in paying for opioids, and the direct costs resulting from opioid use as a result of Defendants' unlawful conduct and are entitled to restitution or disgorgement.

370.    Defendants have been unjustly enriched in the form of increased revenues and profits as a result of their deceptive marketing in violation of the laws of the state of South Carolina. Under equitable principles and due to its unjust enrichment, Defendants should be required to disgorge any profits, plus interest, that were obtained as a result of its misrepresentations.

## FOURTH CAUSE OF ACTION
### NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

371.    Plaintiff incorporates the allegations within all prior paragraphs of this Complaint as if they were fully set forth herein.

372.    All Defendants have a duty to exercise reasonable care in the distribution and marketing of opioids, as provided by state and federal law to avoid the undue risk of widespread addiction to opioids.

373.    The Manufacturer Defendants and Sales Representative Defendants' breached

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

their duties within Lexington County and South Carolina when:

- marketing opioid drugs as safe and effective for the long-term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudo-addiction through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;
- sponsoring, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;
- providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of West Virginia and Federal law;
- endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;
- developing and disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;
- assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;
- creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;
- exclusively disseminating misleading statements in education

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

materials to hospital doctors and staff while purportedly educating them on new pain standards; and,

- making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

374.    The Distributor Defendants breached their duties within Lexington County and South Carolina, and in many cases have admitted such breach, by:

- Failing to design and operate a system to disclose suspicious orders of opioids;
- Once compelled to design and operate a system to disclose suspicious orders of opioids, failing to report suspicious orders as required; and,
- Failing to avoid filling suspicious orders that were ultimately diverted.

375.    The Physician Defendants breached their duties by distributing opioids for nonmedical purposes.

376.    As a direct and a proximate result, Defendants and their agents have caused Plaintiff to suffer damages by (among other things) incurring excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, the County has borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, law enforcement services, first responder services, and child and family services for county residents and using county resources in relation to opioid use and abuse. Additionally, the County has suffered lost productivity from its workforce, thereby losing much needed tax revenue. The Distributor Defendants' acts are willful and wanton. In addition to actual damages, Plaintiff is entitled to a reasonable amount of punitive damages in an amount to be determined by the jury at the trial of the matter.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
## (AGAINST ALL DEFENDANTS)

377.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

378.    Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail above, including:

- The Manufacturer Defendants' and Sales Representative Defendants' marketing of opioid drugs as safe and effective for the long-term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- The Manufacturer Defendants' and Sales Representative Defendants' creating, sponsoring, and/or assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- The Manufacturer Defendants' and Sales Representative Defendants' disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudo-addiction through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- The Manufacturer Defendants' and Sales Representative Defendants' distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;
- The Manufacturer Defendants' and Sales Representative Defendants' sponsoring, directly distributing, and/or assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;
- The Manufacturer Defendants' providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible,

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

"independent third party" appearance and allowing them to side-step labeling regulations in violation of South Carolina and Federal law;

- The Manufacturer Defendants' and Sales Representative Defendants' endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' developing and/or disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- The Manufacturer Defendants' and Sales Representative Defendants' assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' creating, endorsing, and/or supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- The Manufacturer Defendants' and Sales Representative Defendants' exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

- The Manufacturer Defendants' and Sales Representative Defendants' making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

- The Distributor Defendants' holding themselves out as law-abiding distributors but instead withholding from law enforcement the names of prescribers they knew to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating South Carolina and Federal law by not reporting these doctors instead; and,

- The Physician Defendants' falsely representing to patients and the public that they lawfully prescribed opioids for medical treatment when their practice of prescribing was for nonmedical purposes, violated laws, and done for the sole purpose of making profit.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

379.    Defendants should have known at the time that they made their misrepresentations and omissions that they were false.

380.    Defendants should have, at the least, investigated the truth or falsity of their representations to Plaintiff.

381.    Defendants intended that Plaintiff and its residents would rely on their misrepresentations and omissions.

382.    Given the incredible resources Defendants put into crafting their misrepresentations to pervade nearly every source of trusted medical information, Plaintiff and its residents reasonably relied upon Defendants' misrepresentations and omissions, as stated above.

383.    Given the infinitely better-resourced and highly sophisticated nature of the Distributor Defendants' practices, and their intimate knowledge of state and federal legal requirements, Plaintiff and its residents reasonably relied on the Distributor Defendants to uphold its legal requirements and not commit intentional, material omissions to law enforcement for the sake of its own profits.

384.    By reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiff and its residents suffered actual pecuniary damage directly caused by Defendants' deceptive behavior resulting in increased expenditures on public healthcare services, law enforcement, the justice system, child and family services as well as lost productivity and lost tax revenue.

385.    Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

### SIXTH CAUSE OF ACTION
### PUBLIC NUISANCE
### (AGAINST ALL DEFENDANTS)

386.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

387.    Defendants, through the actions described in this Complaint, have created, or were a substantial factor in creating, a public nuisance by unreasonably interfering with a right common to the general public that worked to hurt, inconvenience, or damage and interfere with the enjoyment of life or property.

388.    The County of Lexington and its citizens have a public right to be free from the substantial injury to public health, safety, peace, comfort, and convenience. The interference of this right resulted from Defendants' illegal and deceptive marketing of opioids.

389.    Defendants, individually and acting through their employees and agents, and in concert with each other, made unreasonable and/or unlawful use of their financial resources in an improper, indecent, and unwarranted fashion to wage a massive campaign of misrepresentations and omissions of facts, negligence, and violation of state laws material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail above, including:

- The Manufacturer Defendants' and Sales Representative Defendants' marketing of opioid drugs as safe and effective for the long-term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- The Manufacturer Defendants' and Sales Representative Defendants' creating, sponsoring, and/or assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- The Manufacturer Defendants' and Sales Representative Defendants' disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

of pseudo-addiction through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;

- The Manufacturer Defendants' and Sales Representative Defendants' distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;

- The Manufacturer Defendants' and Sales Representative Defendants' sponsoring, directly distributing, and/or assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

- The Manufacturer Defendants' providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of South Carolina and Federal law;

- The Manufacturer Defendants' and Sales Representative Defendants' endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' developing and/or disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- The Manufacturer Defendants' and Sales Representative Defendants' assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' creating, endorsing, and/or supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- The Manufacturer Defendants' and Sales Representative Defendants' exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

- The Manufacturer Defendants' and Sales Representative Defendants' making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;
- The Distributor Defendants' holding themselves out as law-abiding distributors but instead withholding from law enforcement the names of prescribers they knew to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating South Carolina and Federal law by not reporting these doctors instead; and,
- The Physician Defendants' falsely representing to patients and the public that they lawfully prescribed opioids for medical treatment when their practice of prescribing was for nonmedical purposes, violated laws, and done for the sole purpose of making profit.

390.    The activities of Defendants that created a public nuisance worked as an obstruction or injury to Lexington County and its residents, producing a material annoyance, inconvenience, discomfort, and/or hurt on the County and its residents by causing them to suffer actual damages directly caused by Defendants' deceptive, negligent, and/or unlawful behavior resulting in increased expenditures on public healthcare services, law enforcement, the justice system, child and family services as well as lost productivity and lost tax revenue.

391.    Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

392.    At all times relevant to the Complaint, Defendants exercised control over the instrumentalities constituting the nuisance, Defendants' actions were a substantial factor creating the public nuisance, and the public nuisance was foreseeable to Defendants.    Without Defendants' actions, opioid use would not have become so widespread in Lexington County, and the opioid epidemic that now exists would have been averted or would be much less severe.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

## SEVENTH CAUSE OF ACTION
## CONSTRUCTIVE FRAUD
## (AGAINST ALL DEFENDANTS)

393.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

394.    Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail above, including:

- The Manufacturer Defendants' and Sales Representative Defendants' marketing of opioid drugs as safe and effective for the long-term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- The Manufacturer Defendants' and Sales Representative Defendants' creating, sponsoring, and/or assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- The Manufacturer Defendants' and Sales Representative Defendants' disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudo-addiction through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- The Manufacturer Defendants' and Sales Representative Defendants' distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;
- The Manufacturer Defendants' and Sales Representative Defendants' sponsoring, directly distributing, and/or assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;
- The Manufacturer Defendants' providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible,

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

"independent third party" appearance and allowing them to side-step labeling regulations in violation of South Carolina and Federal law;

- The Manufacturer Defendants' and Sales Representative Defendants' endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' developing and/or disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- The Manufacturer Defendants' and Sales Representative Defendants' assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- The Manufacturer Defendants' and Sales Representative Defendants' creating, endorsing, and/or supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- The Manufacturer Defendants' and Sales Representative Defendants' exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

- The Manufacturer Defendants' and Sales Representative Defendants' making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

- The Distributor Defendants' holding themselves out as law-abiding distributors but instead withholding from law enforcement the names of prescribers they knew to be facilitating the diversion and over-prescribing of their products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs Defendants knew would reach these same prescribers, violating South Carolina and Federal law by not reporting these doctors instead; and,

- The Physician Defendants' falsely representing to patients and the public that they lawfully prescribed opioids for medical treatment when their practice of prescribing was for nonmedical purposes, violated laws, and done for the sole purpose of making profit.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

395. Defendants should have known at the time that they made their misrepresentations and omissions that they were false.

396. Defendants should have, at the least, investigated the truth or falsity of their representations to Plaintiff.

397. Defendants intended that Plaintiff and its residents would rely on their misrepresentations and omissions.

398. Given the incredible resources the Manufacturer Defendants and Sales Representative Defendants put into crafting their misrepresentations to pervade nearly every source of trusted medical information, Plaintiff and its residents reasonably relied upon (and had the right to rely on) the Defendants' misrepresentations and omissions, as stated above.

399. Given the infinitely better-resourced and highly sophisticated nature of the Distributor Defendants' practices, and their intimate knowledge of state and federal legal requirements, Plaintiff and its residents reasonably relied on (and had the right to rely on) the Distributor Defendants to uphold its legal requirements and not commit intentional, material omissions to law enforcement for the sake of its own profits.

400. Given the efforts taken by the Physician Defendants to obtain a medical license, operate a business, and present the outward appearance of legitimate medical practitioners, Plaintiff and its residents reasonably relied on (and had the right to rely on) the Physician Defendants representations that they were providing medical treatment and not engaging in unlawful, nonmedical dissemination of opioids to addicts for the sole purpose of profit.

401. By reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiff had no knowledge of the Defendants' falsehoods and Plaintiff and its residents suffered actual pecuniary damage directly caused by Defendants' deceptive behavior

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

resulting in increased expenditures on public healthcare services, law enforcement, the justice system, child and family services as well as lost productivity and lost tax revenue.

402.    Defendants' conduct was willful, wanton, and malicious and was directed at the public generally. In addition to actual damages, the Plaintiff is entitled to a reasonable amount of punitive damages in an amount to be determined by the jury at the trial of the matter.

### EIGHTH CAUSE OF ACTION
### NEGLIGENCE PER SE
### (AGAINST ALL DEFENDANTS)

403.    Plaintiff incorporates the allegations within all prior paragraphs of this Complaint as if they were fully set forth herein.

404.    The Federal Food, Drug, and Cosmetic Act ("FDCA") places restrictions on branded marketing. It prohibits the sale, in interstate commerce, of drugs that are "misbranded." A drug is "misbranded" if the label is false or misleading "in any particular." Labeling includes more than the drug's physical label; it also includes "all . . . other written, printed, or graphic matter . . . accompanying" the drug, including promotional material.146 Furthermore, the FDCA specifies that drug advertisements must include a true statement of information and an advertisement fails to satisfy this requirement if it is:

- "false or misleading with respect to side effects, contraindications, or effectiveness";
- "Contains a representation or suggestion that a drugs is safer than it has been demonstrated to be by substantial evidence or substantial experience, by selective presentation of information from published articles or other references that report no side effects or minimal side effects with the drug or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated."

405.    The Manufacturer Defendants and Sales Representative Defendants' breached their duties within Lexington County and South Carolina as specified by the FDA when:

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

- marketing opioid drugs as safe and effective for the long-term treatment of chronic pain conditions when they were not, for the purpose of deceiving physicians into using addictive opioids;
- creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;
- disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudo-addiction through Defendants' own unbranded publications and on internet sites Defendants operated that were marketed to and accessible by consumers;
- distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse; indicating that screening tools effectively prevent addiction; and that abuse-deterrent opioids reduce tampering and abuse;
- sponsoring, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;
- providing significant financial support to pro-opioid KOL doctors and Front Groups so they would make deceptive statements concerning the use of opioids to treat chronic pain while maintaining a more credible, "independent third party" appearance and allowing them to side-step labeling regulations in violation of West Virginia and Federal law;
- endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;
- developing and disseminating misleading scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;
- assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;
- creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;
- exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards; and,

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

- making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

406.    The South Carolina Poisons, Drugs, and other Controlled Dangerous Substances Act, S.C. Code Ann. § 44-53-10, *et seq.*, incorporates 21 CFR § 1301.74(b) at S.C. Code Ann. § 44. These regulations impose a non-delegable duty upon the Distributor Defendants to "design and operate a system to disclose . . . suspicious orders of controlled substances. The [Distributor] shall inform the Field Division Office of the Administration in his area of suspicious order when discovered by the [Distributor]. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."149 The stated purpose of the statutory scheme is to reduce the widespread diversion of controlled substances, like opioids, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

407.    The Distributor Defendants breached their duties within Lexington County and South Carolina, and in many cases have admitted such breach, by:

- Failing to design and operate a system to disclose suspicious orders of opioids;
- Once compelled to design and operate a system to disclose suspicious orders of opioids, failing to report suspicious orders as required; and,
- Failing to avoid filling suspicious orders that were ultimately diverted.

408.    The South Carolina Poisons, Drugs, and other Controlled Dangerous Substances Act requires medical practitioners to keep adequate records that are accurate and verify the prescription history of patients receiving opioids.152 Furthermore, the Act makes it illegal for medical practitioners to distribute opioids for nonmedical purposes outside a bona-fide practitioner-patient relationship.

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

409.    The Physician Defendants breached their duties to Lexington County and South Carolina as specified by the South Carolina Poisons, Drugs, and other Controlled Dangerous Substances Act by:

- Distributing opioids for nonmedical purposes;
- Distributing opioids for nonmedical purposes outside a bonafide practitioner-patient relationship;
- Failing to keep adequate records on patients being prescribed opioids;
- Failing to keep accurate records on patients being prescribed opioids; and,
- Failing to verify the prescription history of those whom they prescribed opioids.

410.    All of the aforementioned statutory provisions are designed to protect both individuals and the community-at-large, like Lexington County and the State of South Carolina, from the addictive properties of opioids and the damages caused by opioid addiction, which includes the current opioid epidemic caused by Defendants that Plaintiff is forced to cope with and ameliorate by use of public funds.

411.    As a direct and a proximate result of Defendants' acts and omissions that violated the listed statutory provisions, Defendants and their agents have caused Plaintiff to suffer damages by (among other things) incurring excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, the County has borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, law enforcement services, first responder services, and child and family services for County Residents and using County resources in relation to opioid use and abuse. Additionally, the County has suffered lost productivity from its workforce, thereby losing much needed tax revenue.

412.    The Defendants' acts are willful and wanton. In addition to actual damages, the

ELECTRONICALLY FILED - 2018 Jun 27 1:38 PM - LEXINGTON - COMMON PLEAS - CASE#2018CP3202207

Plaintiff is entitled to a reasonable amount of punitive damages in an amount to be determined by the jury at the trial of the matter.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff demands judgment against Defendants, jointly and severally, awarding Plaintiff:

i.    Compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages;

ii.   Treble damage under the SCUTPA;

iii.  Damages, costs, and reasonable attorney's fees;

iv.   A reasonable amount of punitive damages to be determined by the jury at the trial of the matter;

v.    Interest, costs, and disbursements;

vi.   An injunction forcing Defendants to abate the opioid epidemic ravaging South Carolina and Lexington County, enjoining the distributors from marketing opioids as a) safe for use in chronic pain patients; b) carrying a low risk of addiction in long term use; and c) needed in patients exhibiting signs of "pseudo-addiction."

vii.  Such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ John S. Simmons
**SIMMONS LAW FIRM, LLC**
John S. Simmons (SC Bar No. 10260)
Email: jsimmons@simmonslawfirm.com
Derek A. Shoemake (SC Bar No. 78398)
Email: dshoemake@simmonslawfirm.com
1711 Pickens Street, Columbia, SC 29201
(803) 254-8874

Attorneys for Plaintiff

June 27, 2018